Commonwealth *v.* Barnak, Appellant.

Argued April 14, 1947. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*W. Bradley Ward,* with him *Daniel Sherman, Richard W. Iobst* and *Iobst, Getz & Twining,* for appellant.

*Theodore R. Gardner,* District Attorney, with him *James C. Lanshe,* Assistant District Attorney, and *M. Jack Morgan,* Assistant District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, October 3, 1947:

On December 20, 1945, about 10:45 p.m., Lieutenant Benjamin Clifford Bowman, Jr., who had recently served in the United States Army and was then a student at Lehigh University, was introduced by Gladys Fisher, at the Colonnade Club in Bethlehem, to Mrs. Madeline Barnak. Sixty-five or seventy minutes later he was dying in front of the home of Mrs. Barnak's parents, Mr. and Mrs. Charles Schiffner, 211 South Carlisle Street, Allentown, with a thirty-two caliber bullet in his head.

Mrs. Barnak had not been living with her husband since October 18, 1945, and Lt. Bowman, after meeting her and dancing with her until 11:15 p.m., offered to escort her to her parents' residence. She and he, accompanied by Miss Fisher, left the club at 11:20 p.m., in a car driven five miles by Anthony Brichta, directly to 211 South Carlisle Street.

Lt. Bowman and Mrs. Barnak got out of the car. As the night was cold, Miss Fisher suggested that they close the door so that the driver could go up half a block and turn the car around and pick up Lt. Bowman and return him to Lehigh University. As the car made the "U" turn, Miss Fisher and the driver heard two shots and saw a man running two houses north from the home of Mr. and Mrs. Schiffner, toward Hanover Avenue. The driver, with Miss Fisher, tried to follow the man who was running, but the latter quickly disappeared from view. The man they saw was described by them as short in stature, with broad shoulders, broad hips, and a narrow waistline. "He wore a broad brim hat and a dark overcoat; he ran very awkwardly." This description in its entirety fits John Barnak. Because of an

injury to his leg when he was seven years of age, his left leg was three quarters of an inch shorter than his right leg.

Both Mrs. Barnak and Lt. Bowman had been fatally shot. The former died in a few minutes, and the latter died almost instantly. The time of his death was officially recorded as being at 11:55 p.m., December 20, 1945.

Mrs. Barnak's father, Charles Schiffner, was that night at his home at 211 Carlisle Street, Allentown, with his wife and two daughters. He heard the machine stop and heard two shots fired. He ran out and saw a man with a brown overcoat and brown hat running down the street. The man turned at the corner and looked back. At the corner there was an electric arc light, eighteen and a half feet above the street. Schiffner said: "I recognized him as John Barnak. I recognized him the minute he turned his face that I could see him." At that time the moon was shining.[1] There was snow on the ground.

Mrs. Barnak was carried into her father's house. She was still breathing. The police were summoned. An hour later Schiffner saw Barnak at police headquarters and positively identified him as the man who ran away from the scene of the homicide. He said he first saw Barnak when he was three doors away. At the corner when Barnak turned his head around "the machine lights" from Brichta's car "shone right in his face." Barnak then had an overcoat on.

Raymond L. Higgins testified that he resided at 211½ Carlisle Street, Allentown, and that he was a "next-door neighbor" to Schiffner and was at home at 10:30 to 10:45 p.m. on December 20, 1945, and that he saw a man going away from Higgins' cellar window.

---

[1] The records of the United States Observatory at Washington, D. C., show that at about 11:50 p.m. on December 20, 1945, in the eastern part of Pennsylvania, the moon was "nearly full" and that the full moon began the night before.

The man had on an overcoat and slouch hat, and he said the man was five feet five or six inches tall. When Barnak's hat, Commonwealth's Exhibit F, was shown him, he said it resembled the hat the man had on the night of the homicide; that the overcoat he was shown, Exhibit G, also looked like the coat he saw on the man that night.

Marguerite M. Dennis testified that on December 20, 1945, she was at 116 South Carlisle Street, where her mother-in-law resided. That is the corner of East Hickory and Carlisle Streets. She said that she heard two shots fired, that she stepped outside at the corner, and that she saw a man running down the street toward her, that he was about a quarter of a block away, that he continued running toward her, and that he was about ten or twelve feet away from her when she ran back inside. She said that she got a look at his face; that he had an overcoat and slouch hat on.

Gladys Fisher testified that after hearing shots she saw a man running about "two houses away from the home of Mr. and Mrs. Schiffner," and that she, in Brichta's car, followed this man about a block. "He had gone down an alley." She said the man was "short of stature, had a broad brim hat, dark in color, broad shoulders, broad hips, and a narrow waistline, and ran very awkwardly." When shown Commonwealth's Exhibit G, John Barnak's overcoat, she said: "That looks exactly like what I've seen the night of the murder, December 20th." When asked if she could now identify the man she had seen running from the scene of the crime, she answered: "Yes." Question: "At the time you saw him, was he wearing a slouch hat and an overcoat?" Answer: "Yes." She said: "At police headquarters I was told to identify a man, if I had ever seen him before, wearing a topcoat, broad-rimmed hat. I could not identify him right clearly because he was right in front of me, but the minute they took him away from me I could just picture that was the same image I seen running

December 20th, a few houses from Mr. and Mrs. Schiffner's home."

The Commonwealth also offered in evidence two empty cartridge shells, one found on the porch at 211 South Carlisle Street shortly after the homicide, the other found at 103 South Bradford Street, a block and a half away from the scene, after the shells had been identified by a ballistic expert as having been discharged by the same firearm, and after it was shown that a person fleeing from 211 South Carlisle Street would travel past 103 South Bradford Street in gaining access to the Hamilton Street bridge, and after there was testimony that the defendant was seen running up an alley toward South Bradford Street. To go from 211 South Carlisle Street to the home where Barnak was found one would cross the Hamilton Street bridge.

R. A. Wolf testified that on November 26, 1945, he saw a man, wearing a large coat and a large hat, walking with a limp, prowling around in the neighborhood of 217 South Carlisle Street.

William F. Granitz testified that he had known Barnak for a long time; that he saw him on November 9, 1945; that he asked Barnak if he, Barnak, knew where he, Granitz, could get a girl friend, in a "kidding" way. Barnak said: "Yes." Barnak then gave him a slip of paper and wrote down the name of Madge, 211 South Carlisle Street, evidently referring to Barnak's wife. Granitz said he came back to Barnak in about three quarters of an hour and Barnak asked him, Granitz, "if he was over." Granitz, in a "kidding" way replied: "Yes." He said that Barnak told him, "It's lucky you didn't go over. That's my wife. I'd beat you up, and beat anybody else up that goes with her." When Barnak was asked on cross-examination whether he had said that he'd punch anybody on the nose that he saw with his wife, he said: "One man." When asked who that was he stated: "I don't remember his name, but he was on this witness stand."

Mrs. June Blank, a widow, whose husband, an American soldier, was killed in France, is a sister of Mrs. Barnak and testified that between 11 and 12 o'clock on the night of December 20, 1945, she was at her father's and mother's home at 211 South Carlisle Street. She said Madeline Barnak, her sister, left the house at quarter of nine to meet some friends, and that she did not return until approximately ten minutes of twelve. She said that her mother and father and "my one sister and I were sitting in the living room"; that a car pulled up outside; and that her sister said: "Madeline's coming." She said she looked at the clock and it was ten minutes of twelve, and just a short time after that there were two shots. When Mrs. Blank got outside her sister was staggering across the pavement and said: "Oh, daddy, come and help." She said: "this figure caught my eye, approximately two doors down from our home, he wasn't standing and he wasn't running, he was sort of hesitating, and he was turned around more to the front, and I recognized him as John Barnak, and he started to run immediately, and as he neared the corner he turned to the side, and I saw him again. My father went to this boy that was lying in the street, and I said, 'Here's Madeline,' she was right by the steps —he went off the side and I went directly down—and he came over and started to pick her up, and I said, 'I'll help you,' so we both carried her in and laid her on the davenport."

She testified that her sister and John Barnak had been living apart for two months. When asked further about the identification of Barnak she said that she "recognized everything about him"; that she had the aid of headlights of an automobile coming down the road, The automobile was the automobile of Brichta, which had turned around at the corner.

E. C. Sperling, Captain of Police of Allentown, testified that he left City Hall "at twelve o'clock midnight," December 20, 1945, after receiving a call to go to 211

South Carlisle Street; that he found Lt. Bowman on the street dead, and that Mrs. Barnak was in her father's house mortally wounded. Upon information which Captain Sperling received from Mr. Schiffner and Mrs. June Blank in regard to their recognition of John Barnak as the murderer, Captain Sperling called police headquarters, "in the neighborhood of 12:20, might have been 25." Captain Sperling then went to 634 North Bryan Street. He testified: "I might have gotten there, I imagine, close onto 12:40." Officers O'Donnell and Arndt were already there. When they took Barnak to the police station, he was wearing a brown overcoat. Shortly after Barnak reached the police station, Mr. Schiffner and his daughter came in. Mr. Schiffner said that Barnak was the man "that run away from over there." That was about 1 a.m.

Anthony Brichta testified that he drove from the Colonnade Club directly to 211 South Carlisle Street, that he left the Colonnade at twenty after eleven, that he heard shots as he made a "U" turn at Carlisle Street. He said he saw "a man running about four doors away." The man wore an overcoat and a hat. He had broad shoulders, broad hips. He followed the man to the next block. He said: "I identified a figure at police headquarters that resembled the man I saw running away that night. That man was John Barnak."

Florence M. Schiffner testified that she is the mother of Madeline Barnak and that on the night of December 20, 1945, "at approximately ten of twelve" she heard two shots. When she was asked how she knew the time she said: "I was looking directly at the clock. I was waiting until twelve o'clock to take my medicine;" she was "under the doctor's care." She threw herself on the floor when she heard the shots, and when asked why she did this she said: "Because at one time John Barnak threatened to kill me."

R. A. Wolf testified that he lived four doors below Schiffner on South Carlisle Street, and on the night of

November 26, 1945, when he was ready to retire he saw "a man acting suspiciously and standing behind the Bell Telephone pole." He reported the occurrence to the police. He told Officer Schneck that the man he had seen acting suspiciously "had on a large hat, a long overcoat, and he limped."

A. A. Moser testified that he resided "next door to the Schiffners," that two and a half weeks before the homicide he saw John Barnak "in the neighborhood" about 8:30 or 9 p.m., and that the man "looked suspicious."

Charles Schiffner had also seen John Barnak prowling about the house one night eleven or twelve days before the homicide, and when Schiffner leaned out of the window, Barnak "hollered" at him: "Go on in and mind your own business, this is my business." Another morning about 3:30, within two weeks of the homicide, Schiffner saw Barnak back of the house. Schiffner reported the matter to police headquarters. Two nights before the shooting, Mrs. June Blank saw Barnak in the Schiffner's back yard about 3:30 a.m.

L. M. Whitecotton, a state policeman and ballistician, testified that the bullets which killed the victims were fired from "a Luger 32-caliber automatic firearm."

G. E. Pidcock, County Engineer, testified that the distance between 211 South Carlisle Street and 634 North Bryan Street over the route "which would normally be traveled by anyone going from one point to the other by the shortest route" would be 7,734 feet or 1.464 miles. In traveling that route one would cross "a small field at the tracks between Hamilton Street and Linden Street."

Officer Charles W. Arndt testified he "got a radio call some time after midnight" to go to 634 North Bryan Street. When he arrived, Barnak's mother said John was home. Barnak then came downstairs. He was taken to police headquarters. On cross-examination, Officer Arndt said he didn't remember whether Barnak had

put his shoes on downstairs or whether he had them on when he came down. He was asked: "Did you tell him what he was wanted for?" He answered: "I don't be-live so." On cross-examination, he was asked about the condition of Barnak's bed. He said that the bed clothes "looked as if they had been disturbed." He did not feel the bed to ascertain whether it had just been slept in.[2] Officer Arndt testified that according to the record made of his order to go to Barnak's home the night of the homicide and his compliance with it, he received the order at 12:18 a.m. and arrived at the Barnak home at 12:25 a.m. On cross-examination, he was asked this question: "12:18 was the time you arrived at Barnak's home?" He answered: "Yes." In making that answer he was obviously confused, for the answer is erroneous. The record of the order and its execution, which was put in evidence as Exhibit "C", shows the "time of arrival" at Barnak's home was 12:25 a.m. This is in accord with the testimony of Captain Sperling, who testified as above noted, that he, the Captain, put in a call from 211 South Carlisle Street to police headquarters "in the neighborhood of 12:20, might have been 25"; and that he, Captain Sperling, got to the Barnak home "close onto 12:40," after the other two officers had arrived there. Since this homicide did not take place any later than 11:55 p.m. (according to the clock in the home of Mrs. Barnak's parents, it took place at 11:50 p.m.), Barnak had thirty or thirty-five minutes to travel the distance, which was a little less than a mile and a half, between 211 South Carlisle Street and 634 North Bryan Street.

Officer Joseph P. O'Donnell received a call at 12:10 a.m., December 21st, to go to the two hundred block on

---

[2] The police did some careless work in this case at the time they arrested Barnak. While Captain Sperling said he "looked at his shoes and they weren't 'wet' but looked like new shoes," he did not search the house for other shoes and did not ask Barnak if he had any rubbers.

South Carlisle Street. After he arrived there Captain Sperling ordered him to go to 634 Bryan Street to "pick up John Barnak for the shooting on South Carlisle Street." When Officer O'Donnell reached Barnak's habitation, Officer Arndt was there knocking on the door. The door was opened by Barnak's mother. She had "house clothes on." The officers asked: "Is John home?" She said: "Yes. What's the matter? My John do nothing. He sleeping all night." [3] The officer said: "Call John." She called him and he "came right down." "His hair was mussed; he was fairly calm. He had no shirt on." Arndt testified Barnak had on "a pair of trousers and was wearing a shirt." The latter was "not buttoned down the front."

Barnak's defense was an alibi. When he was taken into custody he told Officer O'Donnell that he had gone to bed about 7 o'clock. Barnak's mother testified John "went to bed" that night about half past nine. His father also testified that when he came home after ten o'clock he "saw John in the bed." No one (except Barnak himself) testified that he *remained* in bed that night. Barnak testified that he "told his mother not to wake him up." He added: "I got in my bed and fell asleep," and he said that when he next got out of bed was when his mother told him to get up that there were policemen downstairs.

If Barnak did not have an automobile to take him from 211 South Carlisle Street to 634 North Bryan Street (and there is no evidence that he did), he would have to travel the distance on foot. It is a matter of common knowledge that a man of Barnak's age, thirty

---

[3] Before Mrs. Barnak had been *told* that her son had been accused of anything and was wanted for two murders committed *that very night*, she asserted to the officers: "My John do nothing. He sleeping all night." That she was already putting up an alibi for her son for *that* night shows that she already knew that he had done something *that* night for which an "alibi" would be useful to him. "Infected minds to their deaf pillows will discharge their secrets."

years, and in good physical condition (as Barnak presumably was because he worked as a pipe fitter's helper and assisted in installing pipe lines and "did some welding") can traverse a distance of 7,734 feet, if he is anxious to do so, in from fifteen to eighteen minutes. The fact just stated is one which is easily demonstrable. The average man of thirty years of age can run a mile in seven or eight minutes and can walk a mile in ten to twelve minutes.[4] The last time[5] anyone saw the murderer of Lieutenant Bowman fleeing from the scene he was running and he "kept on running."[6]

The question whether or not Barnak committed this murder was for the jury, and the evidence fully supported its finding of "guilty." While the verdict was murder in the *second* degree, the evidence warranted a verdict of guilty of murder in the *first* degree, for the crime was that of "murder by lying in wait."

---

[4] A human being *has* run 1 mile in 4 minutes 5-3/10 seconds and 2 miles in 8 minutes 51-3/10 seconds: Gundar Hagg, 1943. A human being *has* walked 1 mile in 6 minues 27-1/5 seconds: Michael Pecora, 1932. And another human being *has* walked 2 miles in 13 minutes 37 seconds: G. H. Goulding, 1916. (Taken from the records of the American Amateur Athletic Union.)

The "get away" of the murderer of Lieutenant Bowman and Mrs. Barnak was facilitated by the fact that the time was midnight in winter, and the streets of the residential area being at that time practically deserted, he could proceed at any unusually fast gait without being observed.

[5] This was apparently at or very near 11:55 p.m. John Howanich, called by the defense, testified that he on his way to work drove a car past the place of the homicide at "approximately ten minutes of twelve" and saw "no commotion" there. Rowland Young, another defense witness, testified that while he was walking to work he passed the place of the homicide "between 11:45 and 11:50 p.m." and "didn't see anything."

[6] R. B. Troxell, a police officer of the city of Allentown, testified that on the night of the murder he went to 211 South Carlisle Street and that he didn't have any trouble walking on the pavement. He said: "There was snow on the pavement, not ice." The murderer of Lieutenant Bowman and Mrs. Barnak apparently found no difficulty in *running* from the scene of his crime.

The appellant chiefly complains of the following excerpt from the charge of the trial judge: "If the Commonwealth has convinced you of the defendant's guilt beyond a reasonable doubt excepting for the alibi that has been set up, then the burden of proving an alibi is on the defendant. But the burden of proving an alibi is not beyond a reasonable doubt; the burden of proving an alibi is only by a fair preponderance of the evidence, and it will be for you, if you are otherwise convinced of the defendant's guilt beyond a reasonable doubt, to take into consideration the defense of alibi that has been raised by the defendant."

In so charging the jury the Trial Judge was obviously endeavoring to help the jurors approach their problem in this logical order: First, they should consider the evidence offered by the Commonwealth as to the defendant's presence at the scene of the murder and his flight therefrom. If after considering this they were convinced of the defendant's guilt they would then before reaching a verdict proceed to consider the evidence that the defendant offered in support of his alibi. This court has frequently stated that an alibi does not have to be supported by proof beyond a reasonable doubt, but only by a fair preponderance of the evidence. The court below so instructed the jury and then said: "it will be for you, if you are otherwise convinced of the defendant's guilt beyond a reasonable doubt, to take into consideration the defense of alibi that has been raised by the defendant." What he meant by the phrase "take into consideration" he showed when a few minutes later in his charge he said: "even though you might find that the alibi does not exclude the possibility of John Barnak having committed the crime, [which was equivalent to saying that if the evidence as to the alibi was not established by a fair preponderance of the evidence] *you have the right to use the shortness of time as creating in your mind a reasonable doubt of the defendant's guilt, if the*

*shortness of the time does create such a doubt in your mind."* (Italics supplied.)

By "shortness of time" the trial judge obviously meant the time that elapsed between the shooting (11:55 p.m.) and the time Barnak was found in his father's and mother's house (12:25 a.m.). This excerpt just quoted made it clear to the jury that if the "shortness of time" created a doubt of Barnak's guilt he was entitled to the benefit of that doubt. This was all the instruction the jury was entitled to on that point. But the trial judge went a great deal further in his charge, for at least nine times he told the jury that the burden was upon the Commonwealth to prove beyond a reasonable doubt *every material averment* of the charge. For example, the trial judge said: "Under all the law and the facts in the case the burden of proof never shifts, but remains with the Commonwealth throughout the trial to prove beyond a reasonable doubt, each and every, all and singular, the material averments in the indictment. If all of this is not clearly and satisfactorily shown beyond a reasonable doubt in this case the jury should acquit the defendant."

And also: "In this case the law raises no presumption against the prisoner, but every presumption of law is in favor of his innocence and in order to convict him of the crime alleged in the indictment, every material fact necessary to constitute such crime must be proved beyond a reasonable doubt upon any single fact or element necessary to constitute such crime, and it is the duty of the jury to give the defendant the benefit of such doubt."

And also: "The Commonwealth must prove the defendant guilty beyond a reasonable doubt, it must prove each material fact that enters into the proof of his guilt, to your satisfaction beyond a reasonable doubt."

And also: "You will bear in mind throughout the case, whether the necessary facts in the case have been proved to your satisfaction beyond a reasonable doubt, and if there is a reasonable doubt as to any point in the

case, then, under the law, the defendant is entitled to the benefit of that reasonable doubt."

And also: "Each fact necessary to the conclusion sought to be established must be proved by competent evidence, that is, evidence that the Court has the right to receive, and must be proved beyond a reasonable doubt."

And also: "All of the circumstances taken together must be of a conclusive nature, leading, on the whole, to a satisfactory conclusion, and producing, in effect, a reasonable and moral certainty that the accused, and no other person, committed the offence."

And also: "Each essential fact relied on must be independently proven; and the hypothesis of guilt should flow naturally from the facts and circumstances proved, and be consistent with them all. The evidence of facts and circumstances must be such as to exclude to a moral certainty, every hypothesis but that of guilt of the offence charged, or in other words the facts and circumstances must not only all be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence."

And also: "He [the defendant] has also brought evidence before you that he was away from the scene of the crime at the time that the crime was committed, and it is for you to determine, under that evidence, which witnesses you want to believe, and whether or not, under the evidence that you do believe, you are convinced beyond a reasonable doubt that John Barnak was the man who fired the shot that killed Lieutenant Bowman."

And also: "You will then determine whether or not the Commonwealth has established its case to your satisfaction beyond a reasonable doubt—and it must establish, as I say, every material fact beyond a reasonable doubt."

What this court said of the charge of the court in the murder case of *Commonwealth v. Malone*, 354 Pa. 180, 184, 47 A. 2d 445, can with equal appropriateness be said of the charge of the court in the instant case:

"The charge in its entirety affords no grounds for the reversal of the judgment and sentence. Certain excerpts if they stood alone might have misled the jury to the defendant's prejudice. . . . Defendant's rights were fully protected by the charge in its totality."

We also said in *Commonwealth v. Schurtz,* 337 Pa. 405, 411, 10 A. 2d 378:

"Isolated excerpts torn from the heart of the charge cannot be considered apart from the context, and if the whole is accurate and fair, as it was in this case, the parts objected to do not form a proper basis for reversal." This same principle was enunciated by this court in *Com. v. Glenn,* 321 Pa. 241, 183 A. 763; *Com. v. Becker,* 326 Pa. 105, 191 A. 351; *Com. v. Stelma,* 327 Pa. 317, 192 A. 906.

Since the defendant's presence at the scene of the murder and his flight therefrom constituted *the* "material element" in this case, that is, the element on the proof of which his guilt had to be established, the trial judge in instructing the jury at least *nine* specific times that the Commonwealth's burden in order to secure a conviction was to prove "every material fact beyond a reasonable doubt" protected the rights of the defendant in complete measure.[7]

---

[7] While this court has approved instructions in homicide cases to the effect that when an alibi is set up the defendant must, in order to have it avail him, prove it by a fair preponderance of the evidence, yet if the evidence in support of his alibi falls short of being preponderating evidence but does raise a reasonable doubt of his guilt he must be acquitted, such instructions constitute an anomaly which it would be well if trial judges would hereafter not repeat. This court in an opinion by Justice KEPHART in *Com. v. Barrish,* 297 Pa. 160, 146 A. 553, referred to such instructions as "incongruous", and we also said in *Com. v. Mills,* 350 Pa. 478, 485, 39 A. 2d 572: "The 'incongruity' to which Justice KEPHART refers is most manifest in cases like the one now before us where practically the basic issue for the jury to consider was whether or not the defendant was at the scene of the homicide when it was committed. When this jury was convinced to a moral certainty that the defendant was at the rather isolated scene of this homicide when it was committed at about

Judge HENNINGER'S charge on the subject of alibi was substantially that of one of the greatest of American judges, to wit, Chief Justice LEMUEL SHAW of Massachusetts.[8] In the oft-cited homicide case of *Common-*

3 a.m. as the identifying witness 'positively' says he was, it probably had but little difficulty in coming to the conclusion that the defendant was guilty." We also said in a footnote on page 486: "In a case factually like this one the Commonwealth is not harmed and there is less likelihood of the jury being confused, if the usual instructions as to the burden resting upon the pleader of an alibi are dispensed with."

In those homicide cases where the killing is admitted and the defense is *self-defense*, the burden is placed squarely on the defendant to establish it by a preponderance of the evidence. We said in *Com. v. Troup*, 302 Pa. 246, 252, 153 A. 337: "Where, however, the right to a verdict rests on defendant's establishing by affirmative and satisfying proof some fact, it is not sufficient for him to merely raise a doubt as to its existence." We enunciated the same rule in *Com. v. Colandro*, 231 Pa. 343, 349, 80 A. 571, and many other cases. It is *consistent* to say, as is said in cases where self-defense is pleaded, that the pleader must establish his plea by a fair preponderance of the evidence, if it is to avail him, but it is not consistent to say when the defense is an alibi that the defendant must prove it by a fair preponderance of the evidence if it is to avail him *but yet* if he does *not* prove it by such a degree of proof, the evidence should work his acquittal if it raises merely a reasonable doubt of his guilt. Expressed in terms of mathematics, such instructions are equivalent to saying that if an alibi is pleaded the pleader must sustain his plea by 51 per cent proof (i.e., preponderating proof) but even if he fails to do so, yet if his evidence *reduces* the Commonwealth's proof of 100 per cent (i.e., proof beyond a reasonable doubt) to 99 per cent, he must be acquitted. Such instructions would be confusing even to legal minds and certainly is confusing to the lay minds of jurors.

It would be better if the jury was instructed, when the defense of an alibi is set up, that the burden remains on the Commonwealth to prove every essential element of the case, including the defendant's presence at the scene of the homicide when, as in the instant case, that is a material element in the case. Wigmore on Evidence, Third Edition, Vol. 9, Sec. 2512(c) says: "It is generally conceded that the accused does not have the ultimate burden of proving an alibi."

[8] "if one were asked to name the great men in American judicial history he would think of Marshall and Story and Kent and Shaw and Gibson and Ruffin." Per Dean Roscoe Pound in "Reports of American Bar Association", Vol. 51, at page 773.

*wealth v. Webster,* 59 Mass. 295, in which the defense was an alibi, Chief Justice SHAW said: "This is a defence often attempted by contrivance, subornation, and perjury. The proof, therefore, offered to sustain it, is to be subjected to a rigid scrutiny, because, without attempting to control or rebut the evidence of facts sustaining the charge, it attempts to prove affirmatively another fact wholly inconsistent with it; and this defence is equally available, if satisfactorily established, to avoid the force of positive, as of circumstantial evidence. . . . In the ordinary case of an alibi, when a party charged with a crime attempts to prove that he was in another place at the time, all the evidence tending to prove that he committed the offence tends in the same degree to prove that he was at the place when it was committed. *If, therefore, the proof of the alibi does not outweigh the proof that he was at the place when the offence was committed, it is not sufficient."* (Italics supplied.)

The Chief Justice also charged the jury (p. 313): "Each fact which is necessary to the conclusion of guilt must be distinctly and independently proved by competent evidence", and (p. 318): "Every circumstance relied upon as material is to be brought to the test of strict proof", and (p. 319): "It is essential, therefore, that the circumstances taken as a whole, and giving them their reasonable and just weight, and no more, should to a moral certainty exclude every other hypothesis."

In the instant case Judge HENNINGER put an equally heavy burden on the Commonwealth, as the excerpts quoted from this charge show. This excerpt from Judge HENNINGER'S charge should be especially noted: *"Each essential fact relied on must be independently proven;* and the hypothesis of guilt should flow naturally from the facts and circumstances proved, and be consistent with . . . and point to the guilt of the accused, *but they*

*must be inconsistent with his innocence."* [9] (Italics supplied.)

The Supreme Court of Pennsylvania expressly commended the charge of Chief Justice SHAW in the *Webster case,* in an opinion by Justice STEWART in *Commonwealth v. Andrews,* 234 Pa. 597, 83 A. 412, where in referring to Chief Justice SHAW's charge this court characterized it as "appropriate and fair". In the *Andrews* case, Justice STEWART said: "This instruction [of the court below] is very largely, if not entirely, an excerpt from the charge of Chief Justice SHAW in the celebrated case of Commonwealth v. Webster, 59 Mass. 295. To say this, is to concede its correctness in the connection in which it was employed by that eminent jurist. But had the learned trial judge in this case looked further into that case, he would have found that this instruction followed upon instruction laying down a no less exacting rule to be applied in determining the effect of accusing evidence in cases where circumstances are relied upon to convict."

Justice STEWART then pointed out that Chief Justice SHAW in *Com. v. Webster* had said that: "every circumstance relied upon as material is to be brought to the test of strict proof; and great care is to be taken in guarding against feigned and pretended circumstances, which may be designedly contrived and arranged, so as to create or divert suspicion and prevent the discovery of the truth."

---

[9] In so charging the jury Judge HENNINGER put on the Commonwealth a heavier burden than was required under the decisions of this Court. In *Commonwealth v. Libonati*, 346 Pa. 504 (a murder case) this court, speaking through Mr. Justice PATTERSON, said, p. 508: "The requirement of the law is that in order to warrant a conviction the facts and circumstances proved must be of such character as to produce a moral certainty of the guilt of the accused beyond any reasonable doubt—not that they need be absolutely incompatible with his innocence . . ." This principle was repeated in *Commonwealth v. New,* 354 Pa. 188, 194, 47 A. 2d 450.

Justice STEWART then said: "Had like instruction with this been given in the present case with respect to the circumstantial evidence adduced against defendant, the court's employment of the words of Chief Justice SHAW, with respect to evidence adduced to establish an alibi, *would have been entirely appropriate and fair.*" (Italics supplied.)

In the instant case the instructions of the court below as to the duty of the Commonwealth to prove *every material fact beyond a reasonable doubt* are even stronger in the defendant's favor than what Chief Justice SHAW said in the *Webster* case about "every material" circumstance relied upon "being brought to the test of strict proof" and meeting that test before the Commonwealth was entitled to a conviction. Judge HENNINGER told this to the jury at least 9 times. This was 8 times more than was necessary to protect the defendant's rights.

In *Commonwealth v. Delfino,*[10] 259 Pa. 272, 102 A.

---

[10] The *Delfino* case in its facts closely resembles the case now before us. The murder was one by lying in wait. Delfino claimed that he was not out of Pitea's store in Archibald, Lackawanna County, where the murder was committed, more than five minutes on the evening of the murder, which took place at 8:11 p.m., April 25, 1916. To leave Pitea's store and go to the "subway" where the murder was committed and then to go to the spot where Delfino placed the revolver and to return to the store, he would have to travel a distance of four fifths of a mile. A witness twenty-nine years of age who traveled this route of four fifths of a mile at an "ordinary rapid gait, such as a man would use in ordinary walking," testified that he was able to cover the entire distance and spend half a minute to a minute at the "subway" where the murder took place and return to the Pitea store, in a period of ten minutes. Four witnesses testified that Delfino was not out of Pitea's store "about five minutes." When the District Attorney cross-examined these witnesses he prolonged his cross-examination so that the entire time each witness was on the stand was from eighteen to twenty minutes. The last question he then asked each of them on cross-examination was: "How long have you been on the witness stand?" Each of them answered: "About five minutes." The District Attorney argued to the jury that the "five minutes" which the witnesses testified Delfino was

949, the eighth assignment of error was based on the following excerpt from the charge of the trial judge: "If you find from the weight of the testimony, from the preponderance of the evidence, that he [the defendant] was not at the scene of the crime at the time of the killing, you must find a verdict of not guilty."

In dismissing all the assignments of error in this case and in sustaining the conviction, with the death penalty, this court, in an unanimous opinion said at page 279, after quoting the above excerpt: "This was a correct statement of the law: Rudy v. The Commonwealth, 128 Pa. 500; Commonwealth v. Andrews, 234 Pa. 597. The court further said in substance that if the defendant was gone from the store long enough to perpetrate the crime and return, referring to such time as fifteen to twenty minutes, then they might find him guilty. This was a proper explanation and called the attention of the jury to the true test of the alibi."

In the case of *Commonwealth v. Barrish*, 297 Pa. 160, 146 A. 553, the court had charged that "Where a person sets up an alibi as a defense, the burden of proving his

away from Pitea's store was actually eighteen to twenty minutes. The jury found Delfino guilty of murder in the first degree, and fixed the penalty at death. Two days before his electrocution, Delfino, in a public statement, admitted his guilt.

In *Commonwealth v. Westwood*, 324 Pa. 289, the defendant was charged with the murder of his wife by shooting her at 1:45 a.m., July 10, 1935. His defense was an alibi. He claimed that he was at "Peyton's roadhouse" between 12:30 and 2:30 a.m. on the date in question. This roadhouse was six miles from the defendant's home, where the murder was committed. The defendant testified he was not out of this roadhouse more than fifteen minutes between 12:30 and 2:30 a.m. Certain witnesses testified that he was out of the roadhouse "about half an hour." Defendant had his car with him on the night of the homicide. In order to commit the murder of which he was charged he would have to travel from the Peyton roadhouse to his home and back to the roadhouse, a total distance of twelve miles. The evidence against the defendant was conclusive and the jury found him guilty of murder in the first degree and fixed the penalty at life imprisonment.

alibi to the satisfaction of the jury is thrown upon him. If he does not do this, his defense of alibi falls completely." This was assigned for error. Justice KEP-HART, speaking for this court, said: "In Rudy v. Com., 128 Pa. 500, 508, we said: 'The burden of proving it [the alibi] was clearly on the prisoner. If he failed to do so to the satisfaction of the jury, the alleged alibi, as a substantive defense, was valueless.' See also Com. v. McMahon, 145 Pa. 413. . . . The facts in such defense are almost exclusively within the knowledge of the accused. In viewing this testimony as arrayed against the Commonwealth's case showing guilt, the court should instruct the jury as to its nature, its purpose and the degree of persuasion necessary to establish it. There is a reason of public policy that justifies such a conclusion. An alibi is frequently used as a defense. The facility with which testimony to support it may be procured from well-meaning or designing persons . . . make it necessary that some rule should be laid down, designed to inform the defendant of the quantity and quality of proof necessary to establish such defense. . . . If evidence of alibi is offered to fortify the presumption of innocence which still stands with him, it must appear to a certain degree of persuasion in order to sustain the defense or raise a reasonable doubt of the defendant's guilt (Turner v. Com., 86 Pa. 54, 73, 74) ; but this requirement does not take from the accused the benefit of his presumption of innocence, for though the alibi be not established to the satisfaction of the jury as a fact, the presumption of innocence is still with the defendant, and the evidence in the case may be enough to raise a reasonable doubt as to guilt. . . . The whole charge shows that the court below did not take from the jury any consideration of the evidence on alibi as bearing on doubt as to the guilt of the accused. In the end of the charge the trial judge said: 'If, however, the alibi as produced by the defendant does satisfy you or if you find that the Commonwealth has failed to convince you of the guilt of the defendant beyond a reason-

able doubt, then your verdict must be an acquittal.' The charge read as a whole does not offend our rules as laid down ... the judgment of the court below is affirmed ..."

In the instant case also when the trial judge instructed the jury as he did, "in order to convict [the defendant] ... every material fact ... must be proved beyond a reasonable doubt upon any single fact or element necessary to constitute such crime, and it is the duty of the jury to give the defendant the benefit of such doubt," the court "did *not* take from the jury any consideration of the evidence on alibi as bearing on doubt as to the guilt of the accused," for his being at the scene of the crime was a most "material fact."

In the instant case the charge was far more favorable to the accused than was the charge in *Rudy v. Com.,* supra, where the trial judge said: "If he [the defendant] failed to do so [i.e., prove his alibi] to the satisfaction of the jury, the alleged alibi, as a substantive defense, was valueless." This court held that *that* was *not* prejudicial error. In *Commonwealth v. Barrish,* supra, the trial judge said the jury must " 'carefully scrutinize and weigh the evidence', [of alibi] and if the evidence of alibi is not satisfactory to the jury 'the defense of alibi falls completely.' " We held that *that* did *not* constitute prejudicial error.

Appellant complains of the admission of evidence of a prosecution instituted against him by his wife. Alderman Schellhamer testified that on October 18, 1945, Mrs. Barnak in his office swore to an information charging her husband, John Barnak, with "unlawfully making an assault upon her—bruising her, striking and kicking her on the legs, throwing articles at her, and various other things." The Alderman called the parties together and effected a settlement, by Barnak agreeing to pay the costs and promising not to molest his wife and to pay $10 a week for her support.

This evidence was admissible. When any defendant is charged with murder, evidence of the prior relation-

ship between him and his alleged victim is always relevant. If that relationship is a friendly one it is competent for the defendant to show it; if it is hostile, it is competent for the Commonwealth to show it. In the instant case the defendant not only testified that he "loved his wife" but he also offered in evidence three letters written by her in May 1945 in which she addressed him in endearing terms. The evidence of *hostile* relations between the husband and the wife subsequent to the dates of the letters is equally admissible. The fact that the Alderman was able to induce Mrs. Barnak to withdraw her charge upon her husband's promise not to molest her does not impair the relevancy of this evidence. When the basic issue is whether or not a man murdered his wife the fact that a short time before the murder his wife charged him with assault and battery is a fact important for the jury to know, for a wife who is living in amicable relations with her husband is not likely to make such a criminal charge against him.[11]

13 R. C. L. 216, page 912, makes the following statements in respect to evidence in homicide cases: "In almost any situation—whether the fact of killing is denied, or whether self-defense is pleaded, or whether it is contended that by reason of provocation the killing is reduced to manslaughter—proof of the previous relations of the prisoner and the deceased, whether friendly or hostile or whatnot, is relevant and competent." (Citing cases from a dozen jurisdictions.)

30 C. J. 372, p. 157, states: "Evidence as to ill will, prior difficulties, and other circumstances characterizing the disposition and attitude of defendant and deceased toward each other is, subject to the general rules as to competency and relevancy, admissible as bearing upon questions of malice and intent . . ."

In *Sayres v. Commonwealth*, 88 Pa. 291, the husband was tried and convicted for the murder of his wife. It

---

[11] When Barnak was on the witness stand he admitted he "slapped" his wife on October 18, 1945.

was held that evidence that the "parties had lived upon bad terms" was properly admitted. In *Commonwealth v. Jones*, 269 Pa. 589, 113 A. 57, it was held that evidence of "a course of ill treatment covering years, with actual assaults, the last about nine months before the killing", was admissible. In *Commonwealth v. Crossmire*, 156 Pa. 304, 27 A. 40, where the defendant was tried for the murder of his mother evidence was admitted showing that he frequently quarreled with her and that on one occasion he made an assault on her. In *Commonwealth v. Minnich*, 250 Pa. 363, 95 A. 565, it was held that "all declarations of personal hostility are admissible in evidence as showing malice and tending to show the criminal intent charged."

It should be noted that when Barnak was on the stand *his own counsel* asked him: "Were you arrested by your wife?" Later in his examination, Barnak's counsel asked him: "Did your in-laws or your wife arrest you during that time?" (After October 18, 1945.) He answered: "Yes. Q. What kind of arrest did they cause to be made? A. For insufficient support, and for stealing bricks out of my father-in-law's yard, and standing in the vestibule of their house saying 'boo' to my wife every time she passed."

Proof of the commission of crime A when defendant is tried for committing crime B is *in*admissible when there is no relationship between the two crimes, but if the commission of crime A reveals animosity and malice on the part of X toward Y, and X is later tried for the murder of Y, his commission of crime A is competent and relevant evidence. In the instant case the defendant admitted committing the assault and battery on his wife on October 18, 1945. His arrest for that crime therefore merged into his admission of guilt. The fact that prosecution terminated by mutual consent before his conviction becomes of no importance.[12]

---

[12] The Act of March 15, 1911, P. L. 20, forbids the cross-examination of a defendant who testifies in his own behalf in a criminal

Appellant also complained of the admission in evidence of the record of a habeas corpus proceeding instituted by Barnak for the custody of his children and of the court's permitting the District Attorney to cross-examine the defendant as to certain allegations which Mrs. Barnak made against him in those proceedings and which he did not in those proceedings deny. Some of these questions were: "Q. Do you remember when she [Mrs. Barnak] was asked, 'Why did you leave your husband?', and she said 'For beating me; the day after my baby was buried, the next night, he gave me such a terrible beating and accused me of killing the child.'?" Barnak remembered these allegations. He was asked if he remembered that his wife testified, "We lived together from October until November, and then he knocked me out a number of times when I was carrying my first baby and I had to be moved; so I went to my mother's home and I called in Dr. Bachman, and Dr. Bachman told me to stay in bed the rest of my time of pregnancy." Barnak remembered that she had made these allegations. The District Attorney asked: "Do you remember, in that habeas corpus proceeding, this question—'Did he physically abuse you otherwise by beatings?' Her answer, 'All of the time I had beatings'." Barnak remembered these allegations. In his trial for *murder* he denied them but the District Attorney showed that in the *habeas corpus hearing* Barnak did not deny any of his wife's testimony concerning his use of physical violence against her. These accusations having been made in Barnak's presence and not having been *then*

proceeding, in regard to his having committed or having been charged with any offense "other than the one wherewith he shall then be charged, *unless* . . . [he] has given evidence tending to prove his own good character or reputation." In the instant case the defendant did offer "character evidence" in his own behalf. He thereby opened the door to evidence of his being charged with another offense. It was his own counsel who brought out the fact that he was arrested for nonsupport of his wife and for stealing bricks from his father-in-law.

*and there denied* these allegations became facts relevant to the issue as to whether or not defendant loved his wife (as he claimed he did) or whether his attitude towards her was one of brutality and violence.

In *Com. v. Vallone*, 347 Pa. 419, 32 A. 2d 889, this court said: "The rule of evidence is well established that, when a statement made in the presence and hearing of a person is incriminating in character and naturally calls for a denial but is not challenged or contradicted by the accused although he has opportunity and liberty to speak, the statement and the fact of his failure to deny it are admissible in evidence as an implied admission of the truth of the charges thus made."

The case now before us is *much stronger* in showing the probative value of unanswered accusations than was the *Vallone* case. In the latter case, the accused was not a party to any litigation trying in court when allegations were made against him which he did not answer. Vallone was seated in the district attorney's office when a girl told a state policeman about Vallone's taking her from place to place for immoral purposes. Vallone at that time was not represented by counsel and he apparently deemed it prudent to say nothing, in the absence of his counsel. In the instant case when Barnak and his wife were litigating in habeas corpus proceedings, the question whether or not he was a fit person for the custody of his and his wife's children was *the fact in issue* and she made accusations showing that he was totally unfit. His failure to answer charges such as any normal man would answer under like circumstances if the charges were not true, *was* evidence which tended to prove those charges. When Barnak was tried for a murder which took place only 10 days after the habeas corpus proceedings and which was obviously motivated by hatred and revenge and when in that trial for murder he *asserted* his love for his wife, it was the district attorney's duty to show the defendant's silence in the face of that wife's then recent allegations as to his ill-will and malice toward her. The court in refusing a new

trial in this case correctly stated: ". . . it was obvious that the motive for the slaying related to Madeline Barnak and not to Bowman. In our opinion, this made all testimony relative to relations between Defendant and his wife relevant despite the fact that Defendant was being tried for the murder of Bowman. The testimony of Madeline Barnak in the Habeas Corpus case was not offered in proof of the charges there made, *but to show the existence of a controversy and of animosity between Madeline Barnak and Defendant.*" (Italics supplied.)

The murder of Lieutenant Bowman was brutal and unprovoked. He was maliciously killed simply because he happened to be courteously escorting to her home a woman whom he had met less than 1½ hours previously. The man who murdered him was positively identified by persons well acquainted with him and by others. The situation that night was favorable for the assassin's identification; it was a moonlight night; an arc light was shining about 15 feet above the murderer's head; the lights from the taxicab were turned on the murderer; the snow on the ground helped visibility. It was inconceivable that any other person than Barnak had any motive for killing Mrs. Barnak and her escort. Barnak admitted on the witness stand that he had threatened to "beat up" any person who "goes with his wife." Barnak was identified as the man who had been prowling recently at night in the neighborhood of the house where his wife resided. Proof of Barnak's guilt of the murder of which he was convicted was so conclusive as to meet the legal standard of proof beyond a reasonable doubt.

The fact that Barnak *thirty minutes* after the homicide was apprehended at a point a little less than one and a half miles from the scene of the crime no more supports his "alibi" than would the fact that he was found at the same point three hours after the crime was committed. If Barnak had to depend on his own footwork to cover the distance of one mile and 2454 feet from the scene of his crime in less than thirty minutes

his problem was an easy one for a man 30 years of age, apparently in good physical condition and accustomed to physical exertion. He had a most powerful incentive to induce him to make all possible speed in getting away from the locus of his crime, and when last seen by those who positively identified him he was *making speed* for he was "running and kept on running." The hour was midnight, the time was winter, and presumably the streets were deserted. Therefore the actions of a man running through the streets or taking "short cuts" would not likely be witnessed by any person and no one would attempt to arrest his flight.

Taking an appeal in criminal cases is not a game in which the appellant wins if he can show that the trial judge fell a few degrees short of perfection in the conduct of his trial. This court has consistently refused to reverse convictions of murder in the first degree, even with the death penalty imposed, for errors in the conduct of the trial or in the admission of evidence or in the judge's charge, when these errors did not deprive the defendant of the fundamentals of a fair trial.

In the recent case of *Commonwealth v. Chavis,* 357 Pa. 158, 53 A. 2d 96, in which the defendant was convicted of murder in the first degree, with the death penalty imposed, this court affirmed the judgment and sentence despite certain manifest errors in the record. In the case of *Commonwealth v. Moyer and Byron,* 357 Pa. 181, 53 A. 2d 736, in which both defendants were convicted of murder in the first degree, with the death penalty imposed, this court affirmed the judgment and sentence despite certain manifest errors in the judge's charge. In *Com. v. Skawinski,* 313 Pa. 453, 169 A. 895, in which the defendant was convicted of murder in the first degree, with the death penalty imposed, this court in an opinion by Mr. Justice LINN refused to reverse the judgment and sentence even though the trial judge in his charge to the jury committed plain error when he said: "If for the good of the community you deem it necessary to find the accused guilty of murder in the

first degree and to fix the penalty at death, you may consider that if that is your duty you should not shirk it."

Defendant's counsel were apparently satisfied with the fairness and adequacy of the trial judge's charge for at its close Judge HENNINGER said to defendant's counsel: "Now, is there anything else you would like to have me charge the jury?" Defendant's counsel, former Judge IOBST, who had had long experience as a trial lawyer and as a judge, said: "No, I think Your Honor has covered it. And for the purpose of the record, will Your Honor grant us an exception to your charge?"

In *Com. v. Mendola,* 294 Pa. 353, 359, 144 A. 292, this court in a unanimous opinion said: "At the conclusion of the charge defendant's attorney said 'No' to the judge's request if there was anything he might add. Thereby the defendant took his chances of the verdict and cannot now complain of mere inadequacy of the charge as to self-defense or of failure of the judge to comment upon the testimony of witnesses: [Citing cases]. 'Where counsel for defendant fails to ask further and fuller instructions or for corrections in the charge, although opportunity is given him, he cannot, on appeal, complain of error in the statement of facts by the trial judge either on the ground of inaccuracy or insufficiency:' [Citing cases]. Mr. Justice SCHAFFER, speaking for the court, in Com. v. Winter, 289 Pa. 284, 297, says: 'As a general rule, in a murder case, where, at the conclusion of the charge, the court asks counsel if they desire further instructions, and no further request is made, questions not then raised will not be considered on appeal'; citing Com. v. Bryson, 276 Pa. 566. To like import are Com. v. Varano, 258 Pa. 442; Com. v. Washington, 202 Pa. 148. The rule being so held in cases of capital conviction there is stronger reason for it where, as here, the conviction is of manslaughter only."

In the case of *Commonwealth v. Bruno,* 316 Pa. 394, 175 A. 518, in which the defendant was convicted of

murder in the first degree, with the death penalty imposed, defendant's counsel were asked at the close of the judge's charge whether any further instructions were desired and no request was made. In that case this court, speaking through Mr. Justice DREW, said: "Where the court's charge substantially covers the points in dispute, and no further requests for charge are made by defendant's counsel, although opportunity for such is given, defendant cannot on appeal complain of the inadequacy of the charge without showing that the alleged omissions contributed to the jury's verdict to defendant's prejudice: Com. v. Pacito, 229 Pa. 328; Com. v. Varano, 258 Pa. 442; Com. v. Winter, 289 Pa. 284; Com. v. Mendola, 294 Pa. 353."

For this court to set aside the conviction of this palpably guilty man because the trial judge after instructing the jury that the burden of proving an alibi by a fair preponderance of the evidence rested upon defendant did not *immediately* thereafter add that even if the evidence of an alibi raised a reasonable doubt of the defendant's guilt he should be acquitted, though the trial judge did say *shortly afterwards* "even though you might find that the alibi does not exclude the possibility of John Barnak having committed the crime, you have the right to use the shortness of time as creating in your mind a reasonable doubt of the defendant's guilt," and though he instructed the jury nine times that the burden of proving *every material element* of the crime charged beyond a reasonable doubt rested upon the Commonwealth, would subject our decision to the just reproach which William H. Taft, (later, successively, President and Chief Justice of the United States) cast upon the administration of criminal law when in an address at Yale Law School on June 26, 1905, he condemned the idea that "any error, however small, which it is impossible to show affirmatively did not prejudice the defendant must lead to reversal of the judgment," and when he said that "courts of appeal [have been led] to a degree of refinement in upholding technicalities in

favor of defendants, and in reversing convictions that renders one who has had practical knowledge of the trial of criminal cases most impatient."[13]

The evidence proved Barnak guilty beyond a reasonable doubt. The jury would have been justified in finding that the killing of Lieutenant Bowman was a case of murder by lying in wait, that is, murder in the first degree.

All the assignments of error are overruled; the judgment is affirmed and the record is remitted so that the sentence imposed can be carried out.

CONCURRING OPINION BY MR. JUSTICE PATTERSON:

I agree that the judgment should be affirmed. The sufficiency of the evidence to sustain the conviction cannot be successfully challenged. Appellant's basic assignment of error relates to two sentences in the charge of the trial judge regarding the defense of alibi.[1] This, as well as other portions of the charge assigned as error, when weighed against the whole charge and the record as an entirety, at most constitute harmless error.

The voluminous evidence overwhelmingly and indisputably sustains the jury's findings that appellant's

---

[13] In this address (which was published in the Yale Law Journal, Vol XV, Nov. 1905) Judge TAFT quoted figures showing that for the then past 20 years there had been in the United States 131,951 murders and homicides and only 2,286 executions. After he quoted these and other figures as to the number of murders and the relatively few executions for them, he said: "As murder is on the increase, so are all offenses of the felony class, and there can be no doubt that they will continue to increase unless the criminal laws are enforced with more certainty, more uniformity, [and] more severity than they now are."

[1] "If the Commonwealth has convinced you of the defendant's guilt beyond a reasonable doubt excepting for the alibi that has been set up, then the burden of proving an alibi is on the defendant. But the burden of proving an alibi is not beyond a reasonable doubt, the burden of proving an alibi is only by a fair preponderance of the evidence, and it will be for you, if you are otherwise convinced of the defendant's guilt beyond a reasonable doubt, to take into consideration the defense of alibi that has been raised by the defendant."

guilt was established beyond any reasonable doubt. Appellant's rights were more than adequately protected by the charge of the trial judge.

Distinction between harmless and prejudicial error transcends confinement by formula or precise rule. Determination of the category into which given error shall be placed requires an exercise of discretion by appellate tribunals which can only be resolved by examination of the entire record. Challenged statements must be viewed not as isolated utterances to a jury, but with due regard to their probable effect when considered with explanatory remarks which preceded or followed the statements in question.

The objective review of an appellate court must guard against magnification on appeal in a criminal case of incidents of little importance in their setting: *Glasser v. United States,* 315 U. S. 60, 62 Sup. Ct. 457. Where the scales of justice are delicately poised between innocence and guilt, error which under some circumstances would not be too great for reversal, should not be brushed aside as immaterial. Where, however, as here, examination of the entire record clearly supports the finding of appellant's guilt beyond any reasonable doubt, and where a fair and impartial trial has been had, and the conclusion inescapable that the error did not influence the jury against the accused, the true administration of justice cannot be negatived by technical error which has not deprived an accused of his legal right to a fair trial: cf. *Commonwealth v. Blose,* 160 Pa. Superior Ct. 165, 170.

Discussion of basic principles regarding determination of harmless error by the Supreme Court of the United States in *Kotteakos v. United States,* 328 U.S. 750, 66 Sup. Ct. 1239, is peculiarly applicable here. Mr. Justice RUTLEDGE said (p. 761-2, 66 Sup. Ct. at 1246) : "By its very nature no standard of perfection can be attained. But one of fair approximation can be achieved.

. . . For, as with all lines which must be drawn between positive and negative fields of law, the precise border may be indistinct, but case by case determination of particular points adds up in time to discernible direction.

"In the final analysis judgment in each case must be influenced by conviction resulting from examination of the proceedings in their entirety, tempered but not governed in any rigid sense of stare decisis by what has been done in similar situations. . . . To weigh the error's effect against the entire setting of the record without relation to the verdict or judgment would be almost to work in a vacuum. . . . In criminal causes that outcome is conviction. . . . It is guilt in law, established by the judgment of laymen. And the question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting. . . . If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand. . . ."

From a reading of the entire record in this case it is unquestionably evident that neither the alleged erroneous instruction on the question of alibi nor the other assigned errors, including the admission of the decree in a habeas corpus proceeding, prejudiced the rights of the appellant. Since the facts warrant a verdict of first degree murder with the death penalty, the verdict of second degree murder clearly shows error, if any, must have resulted favorably to the appellant. This was a cruel, wicked, premeditated murder, determined by a fair and impartial trial.

The judgment of the court below should be affirmed.

DISSENTING OPINION BY MR. JUSTICE JONES, October 3, 1947:

In my opinion the appellant is justly entitled to a retrial because of the manifest error contained in the trial court's plain and unretracted instruction to the jury that ". . . it will be for you, [i.e. the jury] *if you are otherwise convinced of the defendant's guilt beyond a reasonable doubt,* to take into consideration the defense of alibi that has been raised by the defendant." [1] (Emphasis supplied.) Obviously that instruction denied to the appellant's alibi evidence its well-recognized capacity (if believed) to engender, in connection with all the other evidence in the case, a reasonable doubt as to the defendant's guilt, even though the alibi evidence, of itself, was insufficient to establish that the defendant was elsewhere than at the scene of the crime at the time of its commission. See *Commonwealth v. Mills,* 350 Pa. 478, 484, 39 A. 2d 572, where, incidentally, Mr. Chief Justice MAXEY also appropriately reiterated that "a trial judge's charges which are inadequate or not clear, or which tend to mislead are well recognized grounds for reversal" as had been pointedly observed in *Sears v. Birbeck,* 321 Pa. 375, 391, 184 A. 6 (citing cases).

The gravity of the error above indicated could hardly

[1] The charge in its entirety in this connection was as follows: "The defendant has offered another defense, what we call a positive defense, and that is the defense of alibi. An alibi, as we use it in common parlance, is an excuse that is *fabricated* to get ourselves out of a difficulty. In law it does not mean anything of the kind; in law it means a proof that the defendant was at some other place at the time the crime was committed and, being at some other place that he necessarily could not have been at the place where the crime was committed. If the Commonwealth has convinced you of the defendant's guilt beyond a reasonable doubt excepting for the alibi that has been set up, then the burden of proving an alibi is on the defendant. But the burden of proving an alibi is not beyond a reasonable doubt, the burden of proving an alibi is only by a fair preponderance of the evidence, and *it will be for you, if you are otherwise convinced of the defendant's guilt beyond a reasonable doubt, to take into consideration the defense of alibi that has been raised by the defendant."* (Emphasis supplied).

be greater than in a case such as the present where the objective defense consisted entirely of the alibi evidence which was by no means trifling or inconsiderable. Nor is the harmfulness of the error to be explained away on the ground that the learned trial judge correctly instructed the jury in other relevant particulars. Specifically, neither the charge as to the defendant's burden in respect of the alibi nor the repeated statements as to the Commonwealth's burden in seeking a conviction in any way extenuate for the error committed. Likewise, the trial court's specified affirmative error is none the less ground for reversal although counsel did not call it to the judge's attention timely as is required in the case of a factual error in a court's charge; and, that should be especially so upon appellate appraisal of actual error in the trial of murder indictments.

Mr. Justice DREW joins in this dissent.

---

DISSENTING OPINION BY MR. JUSTICE DREW, October 4, 1947:

I cannot accept the decision of the majority as a correct interpretation of the facts and law of this case. I think it the very opposite of that, and in effect a denial of the fundamental and constitutional right of defendant to a fair and impartial trial. After a thorough examination of the voluminous record in the case, I not only am in complete agreement with the dissent of Mr. Justice JONES, but am further of the opinion that a new trial should be granted defendant for the following reasons.

It was error for the Commonwealth to be permitted to offer evidence, over defendant's objection, that on October 18, 1945, over two months before the fatal shooting, defendant's wife instituted a criminal prosecution against him, even though no conviction resulted. This clearly was directly contrary to the rule enunciated by this Court in the recent case of *Commonwealth v. Jones,* 355 Pa. 594, 50 A. 2d 342. In that case we held that mere

evidence of a prior arrest, without proof of conviction, is not relevant evidence in a murder trial. There we said (pp. 597-598) : "Even if it is definitely proved to a jury that a man has been arrested, of what probative value is that fact? Unless convicted, a man remains innocent and the law cannot in justice cast a shadow on his character for a mere arrest. It could not help the jury to know what manner of man the accused was, because the mere fact of an arrest does not prove or disprove anything."

It was error for the learned trial court to admit in evidence the record of a habeas corpus proceeding instituted by defendant for the custody of his children. "It is fundamental that no testimony is admissible unless it is relevant, i.e., unless it is of a nature to afford evidence tending to prove or to disprove the matters in issue": *Commonwealth v. Jones,* supra. A habeas corpus proceeding involving the custody of children is a civil action and the fact that defendant availed himself of his legal right to bring such a suit against his wife was irrelevant in this trial. The district attorney, during cross-examination of defendant, was permitted to read testimony given by defendant's wife in that proceeding, wherein she accused him of unnatural sexual practices and other physical abuse, which accusations defendant had denied. The total effect was extremely harmful to defendant, because while being tried for the murder of Bowman, he was called on to defend himself against collateral issues of a highly inflammatory and prejudicial nature.

It was error to admit the two empty cartridge shells in evidence as an exhibit. Although they were found near the scene of the crime no testimony connected them in any way with the bullets found in the victims' bodies or with defendant. The admission of this evidence was prejudicial to the defense.

It is my considered opinion that this defendant was deprived of a fair and impartial trial and that a new trial should here be granted him.

Mr. Justice JONES joins in this dissent.