Commonwealth v. Fox, Appellant.

Argued April 27, 1971. Before BELL, C. J., JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

*Edward L. Willard,* Special Public Defender, with him *Joseph W. Mullin,* Public Defender, for appellant.

*Newton C. Taylor,* Special Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, October 12, 1971:

Appellant was convicted of murder in the first degree for the slaying of his former wife and received a sentence of life imprisonment. Post-trial motions were made which the court en banc denied on December 16, 1970. Appellant here seeks our view of the validity of his conviction in light of four asserted errors at trial. Having examined the record in its entirety, we affirm the judgment of sentence.

Viewing the evidence, as we must, in the light most favorable to the Commonwealth, the material factual background is as follows:

Appellant lived in the Borough of Huntingdon in Huntingdon County and made a spotty living as a truck driver. In September, 1967, he married the deceased, Argie Dallessandro Fox, who had four children from a former marriage.[1] Theirs was a brief and stormy union, and the divorce was finalized on January 23, 1969. The deceased's eldest daughter, Donna Jean Rush, testified that appellant was extremely possessive and jealous and that the couple also fought continually over money. According to this witness, appellant threatened to kill his wife on at least five occasions.

In April, 1969, appellant was hospitalized due to physical illness. He recuperated at the ex-Mrs. Fox's home but occupied a room across the hall from the deceased.

On September 2, 1969, the deceased's youngest daughters, Karen and Dana, went to bed after watching television. Mrs. Fox retired shortly thereafter. Because of the heat Karen could not sleep, so she went to join her mother in bed.

According to Karen, appellant entered the room and began talking with her mother. They argued, and Mrs. Fox ordered appellant out of the house by the following day. Both the deceased and the child turned away from appellant, and in Karen's words: "Then after that I heard a big bang." The girl saw blood on her

---

[1] The children are: Karen (age 8 at the time of trial); Dana (age 9 at the time of trial); Armand (age 19 at the time of trial); and Donna Jean Dallessandro Rush (age 20 at the time of trial). Only Karen and Dana were living at home when their mother died. Armand is a student at Lehigh Community College, and Donna Jean is married to a corporal in the United States Marine Corps and lives in North Carolina. Donna Jean had lived with her mother for some time during the deceased's marriage to appellant while Donna Jean's husband was serving in Vietnam.

mother's face and ran and awakened her sister, Dana, who came in, saw their mother, and screamed.

Appellant went to the bathroom and obtained a wet washcloth, attempting to aid the deceased. He then telephoned for an ambulance, and the police arrived and took charge. According to the officers, appellant initially stated that the gun would show up in time. He later showed them upstairs and produced the gun from under the mattress of his bed.[2] He was given his *Miranda*[3] warnings but willingly answered the officers' questions, maintaining his wife had committed suicide.

Appellant raises four issues for our review: (1) whether Karen Dallessandro was properly found competent to testify; (2) whether the admission of certain hearsay testimony was so prejudicial as to require a new trial despite the trial court's cautionary instructions; (3) whether it was error to admit into evidence certain allegedly unsupported threats made by appellant; and (4) whether the gun should have been suppressed. Each will be discussed in turn.

As to Karen's competence to testify, it is asserted that the trial court erred in not permitting counsel to interrogate Karen. When the child was first called as a witness, counsel objected to her testifying because, he contended, she did not appreciate the meaning of an oath in that she had told diametrically opposed stories.[4]

The trial court ruled such an inconsistency, even if true, would only go to Karen's credibility and pro-

---

[2] There was conflicting testimony on just exactly where the gun was located. According to one account it was under his mattress; according to another, under his pillow.

[3] See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

[4] The "diametrically opposed" stories were that, according to appellant, Karen stated to the magistrate that she saw the defendant take the gun from his pocket and shoot her mother, while at the habeas corpus hearing she stated that she heard a big bang. Appellant's contention is not entirely accurate, for the transcript of the magistrate's hearing only summarized Karen's testimony.

ceeded to examine her to determine her competence. This was entirely proper.

"Competency is the rule and incompetency the exception. . . . The burden to show incompetency lies upon the party who asserts. . . .

"The question of competency of persons said to be mentally immature due to infancy is to be determined in the discretion of the trial judge after an inquiry as to mental maturity once the fact of infancy appears on the record or is obvious to the judge. This discretion, however, is not absolute but legal. Nevertheless, it will not be reversed in the absence of abuse." *Rosche v. McCoy*, 397 Pa. 615, 619-20, 156 A. 2d 307, 309-10 (1959) (citations omitted).

In *Rosche*, we continued by listing three requirements necessary for determining a child witness's ability to testify: ". . . There must be (1) . . . [a] capacity to communicate, including as it does both an ability to understand questions and to frame and express intelligent answers, (2) mental capacity to observe the occurrence itself and the capacity of remembering *what it is* that she is called to testify about and (3) a consciousness of the duty to speak the truth. These first two considerations are in some instances easily answered where a 7-year-old witness is called upon to testify as to a very recent event. . . ." Id. at 620-21, 156 A. 2d at 310.

We also there recognized the conflicting policy considerations confronting courts attempting to determine a child's ability to testify: ". . . One is that a party should not be denied justice because reliance necessarily must be placed upon the testimony of a child of tender years. But, on the other hand, experience has informed us that children are peculiarly susceptible to the world of make-believe and of suggestions. Care must be exercised to keep the balance true as between these conflicting claims. So it is that much must be left to the

discretion of the trial judge who hears and sees the witness." Id. at 621, 156 A. 2d at 310.

The record clearly supports the trial court's determination of Karen's competency. She gave responsive and clear answers, and she initially indicated explicitly that she knew the meaning of the oath and that she would be "in trouble" if she did not tell the truth.[5] The trial court acted well within the permissible limits of its discretion in personally conducting the competency examination.

Appellant's second assertion of error concerns the testimony of Dana Dallessandro, the other daughter who was home on the night of the shooting. The contested evidence is set forth in the record as follows:

"Q.  Do you remember the night that she died?

"A.  Yes.

"Q.  Could you tell us what you remember about that night?

"A.  Yea.

---

[5] The pertinent portion of Karen's examination by the court was as follows:

"Q.  What grade are you in?

"A.  Third.

"Q.  What kind of marks do you get?

"A.  The last report card I got 'a's' and 'b's' and I didn't get any 'c's', and I got two 's's'.

"Q.  What does the 's's' mean?

"A.  Satisfactory.

"Q.  Do you like to go to school?

"A.  Sometimes.

"Q.  Do you know what it means to swear to something, that is to take an oath? In other words, if you hold up your hand and say, 'I swear', do you know what that means?

"A.  Yes.

"Q.  What does it mean

"A.  Tell the truth.

"Q.  Now suppose you held up your hand and swore to tell the truth and you told us a lie, what would happen?

"A.  I'd be in trouble.

"Q. Go ahead, Dana.

"A. Karen, she woke me up and she said, 'Jack shot Mom', so I got up and then I—

"BY MR. WILLARD: Now, this is objected to and I move to strike that what Karen said to her.

"BY THE COURT: You can't testify to what Karen told you. Guard that, Mr. Taylor, with your questions." After Dana's testimony, counsel approached the bench and stated:

"BY MR. WILLARD: (Sidebar) Co-counsel feels very strongly that I should make a motion at this time for the declaration of a mistrial due to the admission of the statement by this witness that Karen said that Jack shot her mother.

"BY THE COURT: Members of the Jury, I have been advised that this last witness said that Jack shot her mother. There is no testimony to that effect, and you are instructed to disregard that absolutely from your minds. The statement that Jack shot her mother, you will pay no attention to that and you will not consider that when you go to discuss your verdict."

Appellant asserts Dana's statement was so prejudicial that the trial court's subsequent instructions could not possibly undo the damage. We disagree.

No one will gainsay that jurors are requested to undergo a conceivably unattainable degree of mental gymnastics when asked to disregard a statement which they have already heard.[6] However, we do not believe

---

[6] See *Nash v. United States*, 54 F. 2d 1006, 1007 (2d Cir. 1932) where Judge Learned HAND stated that a limiting instruction is a "recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else." See also *Krulewitch v. United States*, 336 U.S. 440, 453, 69 S. Ct. 716, 723 (1949) where Mr. Justice JACKSON observed in a dissenting opinion: "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be an unmitigated fiction."

the prejudice here involved is analagous to the constitutional error pinpointed by the United States Supreme Court in *Bruton v. United States,* 391 U.S. 123, 88 S. Ct. 1620 (1968), where it was held, inter alia, that limiting instructions could not cure the admission into evidence of a codefendant's confession implicating the defendant. A confession is a particularly damaging type of evidence, and nothing so "crucial" or "devastating" was involved in the present case. See *Dutton v. Evans,* 400 U.S. 74, 87, 91 S. Ct. 210, 219 (1970) ; see generally, *Commonwealth v. Thomas,* 443 Pa. 234, 279 A. 2d 20 (1971).

The hearsay here challenged concerned Karen's alleged statement to Dana. However, it had been made quite clear during Karen's testimony that she did not actually see appellant do the shooting. Both she and her mother were facing the other direction at the time, and Karen could only state that she heard ". . . a big bang." Thus, Dana's unsolicited report of what Karen said did not rise to that level of error so prejudicial as to necessitate a new trial, especially in view of the trial court's instructions. Accord, *Commonwealth v. Gwyn,* 441 Pa. 546, 548, 272 A. 2d 891, 892 (1971) (where a witness's unsolicited response that appellant said to her "I killed my cousin" was held to be harmless error).

Appellant's third assertion of error concerns threats reportedly made by him to the deceased. Before the court en banc appellant challenged the trial court's in-

---

Actually, the cautionary instruction here given could better be described as a curative instruction rather than a limiting instruction. It served as an alternative to granting a new trial when inadmissible evidence was heard by the jury. Curative instructions have been thought to be more easily followed than limiting instructions, where a juror is asked to consider evidence for one purpose and not another. See generally, Note, The Limiting Instruction—Its Effectiveness and Effect, 51 Minn. L. Rev. 264 (1966).

structions concerning the threats. That court properly noted that appellant had made no specific objections to the complained of portion of the charge and that appellant could not sit idly by without affording the trial court an opportunity to correct any errors in the jury instructions.

Appellant now abandons his challenge to the charge and focuses on another asserted ground for a new trial by contending that the district attorney exceeded the boundaries of permissible cross-examination when, during his questioning of appellant, he mentioned alleged threats made on two occasions that had not been previously brought out either by appellant or any other witness.

Although the prosecuting attorney in all probability exceeded his proper scope of cross-examination in attempting to explore an incident that had not been previously introduced, any error on this point was harmless. Evidence of at least five threats had been introduced by the deceased's eldest daughter. As we have stated in the past: "Taking an appeal in criminal cases is not a game in which the appellant wins if he can show that the trial judge fell a few degrees short of perfection in the conduct of his trial. This court has consistently refused to reverse convictions of murder in the first degree, even with the death penalty imposed, for errors in the conduct of the trial or in the admission of evidence or in the judge's charge, when these errors did not deprive the defendant of the fundamentals of a fair trial." *Commonwealth v. Barnak*, 357 Pa. 391, 419, 54 A. 2d 865, 878 (1947).

Finally, appellant challenges the admission into evidence of the gun. In essence the issue is whether he voluntarily consented to show the officers where the gun was located.[7] He asserts the Commonwealth has

---

[7] Appellant also argued that the search was not incident to a lawful arrest as he was not given the *Miranda* warning until after

not met its burden of showing consent to the "search" was voluntary.

The record belies this argument and supports the Commonwealth's contention that no "search" as such occurred. The officers testified that in response to their questions, petitioner replied he would get the gun. He then led them upstairs and produced the weapon from under his bed.

The voluntariness of this episode was highlighted by the appellant himself on cross-examination:

"Q. Why wouldn't you let the officers go upstairs, Cummins and Sneath?

"A. I directed them upstairs.

"Q. Didn't you hear Mr. Sneath say that you were reluctant to let them go upstairs?

"A. I heard him say that, yes, but I took them upstairs.

"Q. Well, didn't Sergeant Cummins start upstairs first?

"A. No, he did not.

"Q. Why wouldn't you give the gun to Mr. Sneath?

"A. I was interested in getting her to the hospital.

"Q. Well, you heard Mr. Sneath say that you told him that the gun was there and in due course of time it would be produced. Did you hear him say that?

"A. I heard Officer Sneath say that, correctly.

"Q. Why didn't you give him the gun?

"A. Why didn't I give him the gun?

"Q. Yes.

"A. I did give him the gun.

"BY THE COURT:

"Q. You gave Sneath the gun?

"A. Yes, your Honor, I did."

Counsel asserted appellant was coerced by the attendant circumstances. However, the case is altogether

---

the gun was in the hands of the police. We need not reach this issue, for in our view, no search occurred.

distinct from that described in *Bumper v. North Carolina*, 391 U.S. 543, 88 S. Ct. 1788 (1968), where the officers had a search warrant and later tried to justify the search on the basis of consent. In the present case there was no color of law, for the officers had no warrant. We believe the Commonwealth has sustained its burden of proving "that the consent was, in fact, freely and voluntarily given." Id. at 548, 88 S. Ct. at 1792 (footnote omitted).

Accordingly, as we find appellant's assertions of error to be without merit, the judgment of sentence of the Court of Common Pleas of Huntingdon County is affirmed.

Mr. Justice EAGEN concurs in the result.