**Edgar Earl HUGHES, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 1695.**

Supreme Court of Alaska.

Sept. 10, 1973.

---

Herbert D. Soll, Public Defender, Michael L. Rubinstein, Friedman, Wagstaff, Ravin & Rubinstein, Anchorage, for appellant.

John E. Havelock, Atty. Gen., Juneau, Seaborn J. Buckalew, Jr., Dist. Atty., Stephen G. Dunning, Asst. Dist. Atty., Anchorage, for appellee.

Before RABINOWITZ, Chief Justice, and CONNOR, ERWIN and BOOCHEVER, Justices.

BOOCHEVER, Justice.

On October 27, 1971 Edgar Earl Hughes was convicted of the crime of manslaughter[1] for the death of his wife, Mabel. The case was tried by the court after jury

1. AS 11.15.040 provides:

*Manslaughter.* Except as provided in §§ 10–30 of this chapter, a person who unlawfully kills another is guilty of manslaughter, and is punishable by imprisonment in the penitentiary for not less than one year nor more than 20 years.

trial had been waived. Hughes has appealed from the conviction and sentence of 15 years imprisonment contending that:

1. the court erred in finding him guilty beyond a reasonable doubt;

2. there was no valid and effective waiver of his right to be called as a witness in his own defense; and

3. the sentence was excessive.

## I.

The evidence in the case was circumstantial and Hughes contends that there is a reasonable doubt as to his guilt. The standard for determining the sufficiency of the evidence in a case tried by the court is set forth in Beck v. State:

> Appellant challenges the sufficiency of the evidence to support a finding that his guilt was proved beyond a reasonable doubt. In determining the issue raised by such challenge, the evidence and the inferences to be drawn therefrom are to be viewed in a light most favorable to the state. The question, then, is whether the finding of guilt is supported by substantial evidence, that is, such relevant evidence which is adequate to support a conclusion by a reasonable mind that there was no reasonable doubt as to appellant's guilt. (Citations omitted.) [2]

The following facts were set forth in the court's detailed findings.[3] In May 1971 two rabbit hunters discovered a duffel bag in a wooded area near Mile 81 of the Glenn Highway. After ascertaining that the bag contained the partially decomposed body of a woman, they notified the State Police. The police investigation identified the body as that of Mabel Hughes. The autopsy further revealed that she had been subject to severe blows to the head and body, and that the immediate cause of death was asphyxiation resulting from the flow of blood into the windpipe and lungs as a result of the facial beating.

According to the testimony of several witnesses, on the evening of March 26, 1971, the night on which the murder allegedly was perpetrated, Hughes was drinking in the Alley Cat bar at Anchorage in the company of his employer, his employer's wife and Hughes' girlfriend, Marcia. According to the testimony of his employer and Marcia, Hughes left the bar twice during the evening, once to change his clothes and later to see his wife. On the second occasion, he was gone two or three hours.

According to neighbors, living in a trailer next to that of Mabel Hughes, on a Friday evening late in March, first a 1963 Pontiac belonging to a regular male visitor of Mrs. Hughes arrived, then Hughes came to his estranged wife's trailer in a cab. The Pontiac left, and subsequently the neighbors heard a racket or banging going on in the Hughes' trailer which stopped occasionally and then continued for a substantial period of time. The noise sounded as if an object or someone was being banged against the floor and walls. Neither of the neighbors saw Mrs. Hughes again after that night.[4] The statement Hughes gave to the State Police was that he last saw his wife on the 24th or 25th of March at her trailer. Hughes said a boyfriend of his wife was present but left shortly after he arrived. Hughes told the State Police that he talked to his wife for a few minutes and then went back downtown to where he was drinking previously.

In May, a medical technologist inspected the Hughes' trailer at the request of the

---

2. 408 P.2d 996, 997 (Alaska 1965). *See also* Martin v. City of Fairbanks, 456 P.2d 462 (Alaska 1969); Jordan v. State, 481 P.2d 383, 387 (Alaska 1971).

3. Criminal Rule 23(c) provides:
   (c) *Trial Without a Jury.* In a case tried without a jury the court shall make a general finding and shall, in addition, on request, find the facts specially. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact appear therein.

4. One witness who was thoroughly impeached testified that he saw Mrs. Hughes after March 26. Relatives and friends testified that they neither saw nor heard from her after that date.

State Police, and found numerous stains, which tests revealed to be from human blood. The technologist could not determine the blood type from the tests. The person occupying the trailer subsequent to Mrs. Hughes testified that he had not caused the blood stains.

All of the facts found by the trial judge are supported by the evidence and the inferences to be drawn therefrom. Additional facts support the guilty verdict when viewed in the light most favorable to the State.[5] Mrs. Hughes was 5′ 3″ tall and weighed about 110 pounds. Hughes is a well-proportioned 6′ 2″. Early on the morning of March 27, Hughes' employer went to the trailer to see if Hughes was there. No one answered his repeated knocks and he heard a baby crying. Later in the morning Hughes went to the trailer and took the baby to a friend's house. There was testimony that decedent always wore a watch with an unusual chain lock. Subsequent to March 26, 1971, the date of death as found by the judge, Hughes gave such a watch, with a broken band, to Marcia. Decedent's body was found in a duffel bag with a zipper on its side. Around March 26, Hughes brought two duffel bags to the place where he and Marcia were staying. One of the bags had a zipper on the side. Several nights after the March 26 incident Hughes came to the mobile home where Mabel had resided and took a lot of things to the garbage and to his car.

After carefully reviewing all of the evidence, including that summarized above, we hold that the finding of guilt was supported by substantial evidence, that is, such relevant evidence which is adequate to support a conclusion by a reasonable mind that there was no reasonable doubt as to appellant's guilt.

## II.

Hughes did not testify at the trial and contends that he did not waive his right to take the stand in his own defense.

The accused did not have the right to testify at common law. "The competency of accused persons was first declared in Maine, in 1864, and was not finally reached in England until 1898; it now remains unaccomplished in Georgia only." [6] The delay in granting the right was due to the belief that subjecting the accused to cross-examination would be more injurious than any benefit gained by testifying. It was thought that if permitted to testify, the accused would be seriously prejudiced by failure to take the stand.[7] These theories are no longer accepted.

Alaska Criminal Rule 26 provides that the competency of witnesses shall be governed by Civil Rule 43, which in turn specifies in part:

The following persons are not disqualified to be witnesses.

[a] Parties or other persons who have an interest in the action.[8]

In contrast to the right not to testify, there appears to be a paucity of authority

---

5. Although we, as an appellate court, cannot add to a finding of fact, we do take notice of facts appearing in the evidence which are undisputed. 9 Wright & Miller, Federal Practice and Procedure, Civil § 2577, at 697–702 (1971) [interpreting Rule 52(a) of the Federal Rules of Civil Procedure, which is substantially similar to Alaska Civil Rule 52(a)]; Yanish v. Barber, 232 F.2d 939, 946–947 (9th Cir. 1956); Sbicca-Del Mac, Inc. v. Milius Shoe Co., 145 F.2d 389, 400 (8th Cir. 1944); Boswell v. Rio De Oro Uranium Mines, Inc., 68 N.M. 457, 362 P.2d 991, 995–996 (1961).

The same considerations apply to a court-tried criminal case. Criminal Rule 51 specifies in part: "If no specific procedure is prescribed by rule or statute, the court may proceed in any lawful manner not inconsistent with these rules, the constitution, and the common law."

6. II Wigmore on Evidence § 579, at 701 (3d ed. 1940). In 1962 Georgia provided for the right of an accused to testify. Georgia Evidence Code § 38–415.

7. *Id.* at 703.

8. Alaska Civ.R. 43(g)(1) [a].

with reference to the right to testify.[9] The United States Supreme Court has recently stated that: "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so."[10] In United States v. Bentvena, the Second Circuit Court of Appeals referred to the federal statute removing the disability against a defendant testifying, stating:

> This statutory "privilege" to testify in one's own behalf has come to be recognized as having an importance similar to the right to be present at one's trial and to present a defense. . . .

> The privilege has been described as one of "inestimable value." Yates v. United States, 227 F.2d 844, 846 (9th Cir. 1955). The statute renders the accused competent "provided *only* that he testifies at his own request." Heitler v. United States, 244 F. 140, 141 (7th Cir. 1917) (emphasis supplied). See also Brown v. United States, 56 F.2d 997 (9th Cir. 1932); Wolfson v. United States, 101 F. 430 (5th Cir. 1900). It has been held by at least one state court that denial of the privilege deprives the accused of a fair trial. People v. Rakiec, 260 App.Div. 452, 23 N.Y.S.2d 607 (1940), aff'd 289 N.Y. 306, 45 N.E.2d 812 (1942). See also People v. Rosenzweig, 135 Misc. 324, 239 N.Y.S. 358 (Sp.Sess.1929).[11]

In *Bentvena* one of the accused had requested to testify but was denied that right due to his prior disruptive conduct. The appellate court reversed his conviction stating: "In view of the importance of the privilege, we cannot say that Salvatore Panico waived his privilege to testify in his own behalf."[12]

In United States v. Poe,[13] the trial court set aside a conviction. The defendant did not testify because he relied on the incorrect advice given by his counsel on the then applicable law pertaining to impeachment. The circuit court upheld the setting aside of the conviction, but stated as to the reason that counsel gave his client in advising him not to take the stand:

> If he had not disclosed it, or if he had indicated that his reason was a weakness in Poe's personality or a bad record, neither the District Court nor this court suggests that counsel's decision could have been questioned in any proceeding in any court. Counsel therefore remain free to keep defendants from testifying whenever counsel see fit. Any suggestion to the contrary is chimerical.[14]

■ Despite the dictum of *Poe*, we believe that it is preferable that a defendant be permitted to testify if he so requests. The right to testify in one's own behalf is often of vital importance in a trial. No defendant requesting to testify should be deprived of exercising that right and conveying his version of the facts to the court or jury, regardless of competent counsel's advice to the contrary. As in the decision to plead guilty or not guilty,[15] the ultimate decision should be that of the defendant, made with advice of counsel.

■ After Hughes' conviction, at the request of his appellate counsel a hearing was held to receive testimony from Hughes and his trial counsel concerning Hughes'

9. Ferguson v. Georgia, 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961), contains an informative and detailed discussion of the right to testify, although the decision is based on narrower grounds pertaining to the right to assistance of counsel.

10. Harris v. New York, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1, 4 (1971). "Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him." Walder v. United States, 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503, 507 (1954).

11. 319 F.2d 916, 943, cert. denied sub nom., Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963).

12. 319 F.2d at 944.

13. 122 U.S.App.D.C. 163, 352 F.2d 639 (1965).

14. *Id.* at 641. *See also* Sims v. Lane, 411 F.2d 661 (7th Cir. 1969).

15. 1 Wright & Miller, Federal Practice and Procedure, Criminal § 171, at 355–56 (1969).

failure to testify. Judge Burke thoughtfully entered his findings at the conclusion of the hearing. Substantial evidence supports the findings that Hughes knew that he had the right to take the witness stand. He was advised not to testify. The decision was a tactical one made in the genuine belief that Hughes might very well harm his own case. Hughes elected to follow his attorney's advice.

The testimony was clear that despite his knowledge of the right to testify, Hughes never requested that he be allowed to testify. He accepted the advice of his lawyer because he thought the attorney knew best. Hughes was aware that most of what he wanted to say would be presented to the jury by means of the statement which he gave to the police and that if he took the stand he would be subject to cross-examination. He concurred with the advice of his attorney that he should not take the stand because he would be too nervous.[16]

Q: Okay. I believe, is this correct, that you told the judge here just a few minutes ago that he told you you shouldn't take the stand because you'd be too nervous?

A: Well, I mean that was obvious, right there.

Q: Did Mr. Bookman tell you that?

A: And I was.

Q: Did he tell you that?

A: Well, I imagine he had more reasons than that, too, I don't know.

Q: Did he ever tell you any reasons?

A: No, he didn't tell me all the reasons, no.

Q: Did he tell you that, that you were too nervous?

A: Well, I was nervous at that time, yes.

In United States v. Von Roeder,[17] a defendant indicated that he wished to testify. His counsel advised against it and moved to be allowed to withdraw from the case if his client took the stand. The motion to withdraw was denied, but the judge advised the defendant in some detail as to the effect of his testifying. The defendant finally stated: "Well, I will just leave it to my attorney." After further conferences the attorney indicated that the problem was resolved and the defendant would not take the stand. The court found no error stating: "The record thus shows a complete examination of the issue, and that defendant was then satisfied with his decision, and that it was arrived at after proper consideration."

In the instant case, based on all of the testimony we conclude that Hughes knowingly and intelligently waived his right to testify.[18]

III.

Hughes contends that the trial court's sentence of 15 years for manslaughter is excessive, and that the trial court abused its discretion in not giving weight to sentencing factors other than societal condem-

16. Counsel considered numerous aspects with reference to the decision to advise against testifying. He felt that there were weaknesses in the State's circumstantial case and that defendant's testifying could shift the emphasis from those defects to questions of Hughes' credibility; that Hughes would not do well on cross-examination by the prosecutor who was an effective cross-examiner; and that Hughes' statement which went into evidence contained most of the things he had to say.

17. 435 F.2d 1004, 1008–1010 (10th Cir. 1970), rehearing denied (1971).

18. Since Hughes, himself, knowingly and intelligently waived his right to testify, we do not reach the questions presented in Lanier v. State, 486 P.2d 981 (Alaska 1971), where it was assumed that counsel waived the right to cross-examine witnesses without consultation with the client; or in our recent case of Lee v. State, 509 P.2d 1088 (Alaska 1973), involving an attorney's attempted waiver of his client's right to be present when the jury's verdict was returned. In neither Lanier nor Lee did it appear that the defendant knowingly and intelligently waived the right.

nation. In opposition, the State contends that the trial court has considerable discretion in sentencing; that the transcript indicates that the judge carefully considered appellant's evidence and all relevant sentencing factors; and that consequently, the judge properly exercised his discretion in arriving at this sentence due to the extreme seriousness of Hughes' offense.

■ This court first confronted the issue of appellate review of criminal sentences under AS 12.55.120 in State v. Chaney.[19] In *Chaney,* we acknowledged that sentencing is a discretionary judicial function, but stated that when a sentence is appealed, the court "will make [its] own examination of the record and will modify the sentence if [it is] convinced that the sentencing court was clearly mistaken in imposing the sanction it did".[20] The court further found the objects of penal administration to be multiple:

> Within the ambit of this constitutional phraseology are found the objectives of rehabilitation of the offender into a noncriminal member of society, isolation of the offender from society to prevent criminal conduct during the period of confinement, deterrence of the offender himself after his release from confinement or other penological treatment, as well as deterrence of other members of the community who might possess tendencies toward criminal conduct similar to that of the offender, and community condemnation of the individual offender, or in other words, reaffirmation of societal norms for the purpose of maintaining respect for the norms themselves. (Footnote omitted.) [21]

The weight to be given to the trial court's sentence and the standards by which such review is accomplished were more fully explained in Nicholas v. State, in which we said:

> This court recognizes that the primary responsibility for sentencing must remain with the trial judge. The objectives of sentence review will be achieved only if the sentence that is initially fixed is based on the conscientious effort of the trial judge to arrive at the sentence which best suits the case at hand.

> But respect for the discretion of the trial judge will not prevent this court from making our own examination of the record and we will modify the sentence if we are convinced that the sentencing court was clearly mistaken in imposing the sanction it did. (Footnotes omitted.)[22]

■ With the above tests in mind, we turn to the record and the facts of this particular case. The appellant in this case, Hughes, was on trial for first-degree murder but was convicted of a manslaughter, a lesser-included offense, on the basis that the judge was not convinced beyond a reasonable doubt of the elements of premeditation or malice. The sentence provided in this state for manslaughter is "not less than one year nor more than 20 years". (AS 11.15.040)

In arriving at the sentence, the trial court conducted a sentencing hearing on March 1 and March 2, 1972 at which it examined testimony of a number of witnesses and heard argument by appellant's counsel. The State concurred with the recommendation of the probation officer that Hughes be sentenced to 15 years, with eligibility for parole only after one-third of the sentence had been served. Hughes' attorney recommended immediate probation noting that Hughes had already been incarcerated for 10 months. The court's sentence of 15

19. 477 P.2d 441 (Alaska 1970).

20. *Id.* at 444.

21. *Id.* at 444.

22. 477 P.2d 447, 449 (Alaska 1970). Sentences have been affirmed as falling within the "zone of reasonableness". Hixon v. State, 508 P.2d 526, 527 (Alaska 1973).

1122

years provided for eligibility for parole at the discretion of the parole board.[23]

In pronouncing sentence, the judge reviewed the *Chaney* criteria. He considered the pre-sentence investigation and the defendant's prior criminal record which he did not regard as major.[24] The brutal nature of the offense, whereby the victim was beaten to death by an assault administered over an extended period of time, led the court to conclude that this was one of the most aggravated type of offenses falling in the category of manslaughter. The judge stated: "I think in determining a sentence one should consider something about the nature of the offense, you must consider the offender, but also the nature of the offense." The judge indicated that he did not consider Hughes as the worst defendant that had been before him, but that the crime committed was extremely serious. Particular emphasis was given to respect for societal norms. The judge emphasized the goals of deterrence of the offender after release, deterrence of other members of society who might possess similar criminal tendencies, and community condemnation of the offender or reaffirmation of societal norms.

It is apparent that the court gave careful consideration to many factors. While we do not necessarily agree with the primary emphasis placed on the element of "reaffirmation of societal norms", we find that proper factors were considered. The judge had a reasoned basis for his decision and we conclude that the court was not clearly mistaken in the sentence imposed. Affirmed.

FITZGERALD, J., not participating.

23. In Asitonia v. State, 508 P.2d 1023, 1027 (Alaska 1973), we affirmed a 20-year sentence for manslaughter, commenting that "the judge did not set any mandatory time to be served but rather left it to the expertise of the parole board to determine after careful supervision and examination when the defendant has been successfully rehabilitated and can be released to society at large."

24. Hughes had previously been convicted of the offenses of assault and battery (twice), intimidating a witness, breach of the peace, driving while under the influence of liquor, and public drunk.