**Emil KVASNIKOFF, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 1985.**

Supreme Court of Alaska.

May 3, 1974.

———◆———

Herbert D. Soll, Public Defender, Anchorage, Robert G. Coats, Asst. Public Defender, Fairbanks, for appellant.

Norman C. Gorsuch, Atty. Gen., Juneau, Thomas M. Wardell, Dist. Atty., Kenai/Kodiak, for appellee.

Before RABINOWITZ, Chief Justice, ERWIN, BOOCHEVER and FITZGERALD, Justices, and DIMOND, Justice Pro Tem.

ERWIN, Justice.

The determinative issue in this appeal is whether there was sufficient evidence to support the superior court's finding that appellant was guilty of the crime of manslaughter.

At approximately 10:00 p. m. on September 2, 1972, Kitty Kvasnikoff was discovered unconscious in a hotel room in Seward, Alaska. She was taken to a hospital and there pronounced dead. An autopsy determined that she died from internal bleeding caused, according to the examining physician, by a sharp blow to her lower abdomen.

Appellant Emil Kvasnikoff, the decedent's husband, was arrested on September 5, 1972, and subsequently indicted for manslaughter.[1] He waived a jury trial, and on January 31, 1973, the superior court found him guilty as charged. Imposition of sentence was suspended and he was placed on probation for five years.

The state's case was entirely circumstantial. The relevant events of September 2 were primarily established through the testimony of Mrs. Clark, supervisor of the Van Guilder Hotel; her husband; and Dr. Rogers, the pathologist who testified as to the cause of death.

According to the Clarks, at approximately 5:30 p. m. Emil and Kitty Kvasnikoff entered the lobby of the Van Guilder Hotel. Both appeared to be intoxicated, Kitty more so than Emil. They sat on a couch in the lobby and drank coffee. Kitty absently petted a small dog that had jumped up on the couch. She was slumping on the

[1]. AS 11.15.040 provides:
    *Manslaughter.* Except as provided in §§ 10–30 of this chapter, a person who unlawfully kills another is guilty of manslaughter, and is punishable by imprisonment in the penitentiary for not less than one year nor more than 20 years.

couch, but the Clarks attributed this to her intoxication.

At approximately 5:45 p. m. the Kvasnikoffs left the hotel lobby and climbed a flight of stairs to their room, which was on the second floor directly above the lobby.[2] Emil was partially supporting Kitty, who was walking with difficulty. Again the Clarks attributed this to her obvious intoxication. Shortly thereafter the Clarks heard a loud noise and Mr. Clark went to investigate. He found Kitty leaning against the wall of the hallway and Emil fumbling with the lock on the door to their room. Satisfied that nothing was amiss, Mr. Clark went back downstairs.

At about 8:00 p. m. the Clarks heard loud noises emanating from the Kvasnikoffs' room and went upstairs to investigate. Upon arriving they observed Emil lying on the bed clad in his underwear. Kitty was kneeling on the floor with her back to the door and an open suitcase before her. According to Mr. Clark, Kitty neither spoke nor moved. Mrs. Clark thought Kitty may have muttered something unintelligible. Mr. Clark spoke briefly to Emil about being careful with cigarettes. Emil answered that he had none.

Believing the noise to have been caused by the suitcase falling to the floor and finding nothing apparently wrong, the Clarks departed. They heard no further loud noises, nor any arguing or fighting. They testified that they would have necessarily heard any such sounds if they had occurred, since sound carried well in the building and their position in the lobby was located directly below the Kvasnikoffs' room.

At about 9:30 p. m. Emil appeared in the lobby alone, drank coffee, smoked a cigarette, and conversed with Mr. Clark. Both Clarks thought Emil was almost sober by this time. Mr. Clark thought him nervous. Emil left the hotel for about ten minutes.

When he returned he went directly upstairs without speaking.

At approximately 10:00 p. m. Emil returned to the lobby and asked Mr. Clark to call an ambulance. When Mr. Clark inquired as to the reason for the request, Emil stated: "I think my wife is—my wife is in bad shape. She's gone I'm afraid." The Clarks then went upstairs to the Kvasnikoffs' room and found Kitty on the bed. There were no evident signs of a struggle in the room. Both the door to the hallway and the door to an adjoining room, which was unoccupied at the time, were unlocked.

Mrs. Clark testified that the doors leading to the fire escape were kept locked from the inside. She also stated that she had checked the hallways several times during the evening, as was her custom. Apparently she saw nothing unusual during her checks.

Dr. Rogers, the pathologist who conducted the autopsy, testified that he found three bruises on Kitty's scalp, one located on the back and the other two on the front of her head. The larger bruise covered the whole back of the head. According to him, the bruises occurred within an hour or so of death.

Dr. Rogers further testified that the wounds causing death consisted of two lacerations in the abdomen. One involved an avulsion of the posterior peritoneum. The soft tissues along the spine had been shorn off and one of the arteries in the area torn. In addition, there was a 3½ inch rip in the mesentery. The cause of death was hemorrhage from the abdominal wounds.

The doctor stated that it would take a large amount of force delivered to the lower abdomen to cause such wounds. It was his opinion that anyone receiving such a blow, would, even if highly intoxicated, be able to walk only with great difficulty and would be complaining of pain. In answer to the question whether such an injury could have been caused by a knee, fist,

---

2. A former employee testified that the hotel had three floors and was operated primarily as a women's dormitory in conjunction with the Seward Skill Center.

foot or elbow, the doctor stated that he found it hard to believe that such wounds could be inflicted by an elbow. However, a foot or a knee could inflict such injuries, and a fist might. He felt it unlikely that the injures could have occurred as a result of a crumpling to the floor; and if they occurred from a fall, it would have had to be a fall from a substantial height. The doctor believed that even if one had fallen from a stepladder, he would have had to land on a small hard object, the padded arm of a divan or a bowling ball, for example, to cause the type of injuries Kitty suffered.

Appellant challenges the sufficiency of this evidence to support his conviction for manslaughter. The standard of review applicable to a finding of guilty in a criminal case is set out in Hughes v. State.[3]

> [T]he evidence and the inferences to be drawn therefrom are to be viewed 'in a light most favorable to the state. The question, then, is whether the finding of guilt is supported by substantial evidence, that is, such relevant evidence which is adequate to support a conclusion by a reasonable mind that there was no reasonable doubt as to appellant's guilt.

It is clear that the substantial evidence test can be satisfied by circumstantial evidence alone.[4]

Appellant does not contradict any of the evidence. Rather he suggests here that the evidence and the inferences which can be permissibly drawn therefrom were as consistent with his innocence as with his guilt. In his view, there was at least a reasonable doubt that he had not committed manslaughter. Initially, he argues that the evidence did not exclude the possibility that Kitty received the fatal blow accidently, either before or after entering the hotel, by falling while intoxicated against a small hard object.

It is true that this possibility was not foreclosed by direct evidence. However, the accident theory was rendered less than likely by the testimony of Dr. Rogers and the Clarks. Dr. Rogers testified that a blow of the type received by Kitty would have resulted in death *most often* within two hours. This places Kitty in the hotel at the time her fatal injury was inflicted. Dr. Rogers also felt that having received such a blow, the victim, even if intoxicated, would have walked with great difficulty, would have been in obvious pain, and would have probably complained aloud. The Clarks testified that upon her arrival at the hotel Kitty appeared to be drunk rather than injured and did not complain of physical distress. In addition, she drank coffee and absently petted a dog, activities seemingly inconsistent with the theory that Kitty was then in pain. Thus, it may reasonably be inferred that Kitty did not suffer her injuries prior to arriving at the hotel.

Dr. Rogers did testify that it was possible that the fatal blow could have been caused accidently if the victim had fallen on a relatively small hard object while walking fast or after falling from a height. He felt, however, that due to the amount of force necessary to have caused the injury, such an explanation was unlikely. Also, as the state points out, there was no such object in the Kvasnikoffs' room,[5] and Kitty apparently did not leave the room after 6:00 p. m. Thus, while the evidence, taken as a whole, does not preclude the possibility of an accident, it nevertheless establishes that such an explanation is improbable.

---

3. 513 P.2d 1115, 1117 (Alaska 1973) (citations omitted), *quoting* Beck v. State, 408 P.2d 996, 997 (Alaska 1965).

4. Hughes v. State, 513 P.2d 1115, 1117–1118 (Alaska 1973); Jordan v. State, 481 P.2d 383, 387 (Alaska 1971); Martinez v. State, 423 P.2d 700, 703–704 (Alaska 1967).

5. The superior court judge personally inspected the hotel room during the trial. Apparently he found nothing there to substantiate a theory of accidental injury.

Appellant next contends that the court's finding of guilt was inconsistent with its ultimate conclusion that appellant had no memory of striking his wife on the evening of her death. He argues that the evidence established that there was no reason why he would not have remembered striking Kitty had he actually done so. In support of this contention appellant points out that although he appeared intoxicated early in the evening, he was nevertheless able to walk and talk intelligently. Appellant also points out that the Clarks testified that when he came down to the lobby at about 9:30 p. m. he appeared "quite sober," and that Chief Bagron of the Seward police stated that appellant appeared sober when interviewed approximately three hours later.[6]

We are unable to agree with appellant's contention.[7] None of the testimony established that he was completely sober between the hours of 8:00 and 9:30 p. m., when Kitty's injuries were apparently inflicted. It would have been reasonable for the court to infer that during this time appellant's perception and memory were so impaired by his intoxication that he had no memory of his actions, even though his faculties of speech and balance were not similarly impaired.[8]

Even assuming, however, that the court made no such inference, we feel that the finding of "non-memory" has been over-emphasized by appellant in view of the uncontradicted evidence of his actions and statements during the hour between 9:30 and 10:30 p. m. The Clarks last visited the Kvasnikoffs' room about 8:00 p. m., at which time Kitty was alive and apparently well. At about 9:30 p. m. appellant returned to the lobby. While there, he drank coffee, smoked a cigarette, and conversed with Mr. Clark, who thought him nervous. He then left the hotel for about 10 minutes. When he returned he went directly upstairs without speaking.

At approximately 10:00 p. m. he again appeared in the lobby and requested that Mr. Clark call an ambulance. When Mr. Clark inquired as to the reason for the request, appellant stated: "Well, I think my wife is—my wife is in bad shape. She's gone I'm afraid." Minutes later he made the statement: "I don't think she's going to make it." or "It looks like she isn't going to make it." In neither conversation did appellant offer any explanation for his apprehension concerning his wife's impending death. The obvious inference which may be drawn from this observation is that appellant, aware of Kitty's imminent death, deliberately chose not to explain the circumstances surrounding his wife's injuries —an inference consistent with the court's finding that he struck his wife while they were alone in the room.

Further, on September 3, 1972, appellant made a statement to the police in which he

6. In addition, appellant points out that Dr. Langdon, a psychiatrist, testified at a suppression hearing that there was no psychological or psychiatric explanation why appellant would not remember if he had actually hit his wife. His testimony was not, however, introduced at trial. Therefore, we cannot consider it on appeal.

7. The state contends that the court's conclusion that appellant had no memory of striking his wife on the evening of her death was erroneous, since it was apparently based upon inadmissible polygraph testimony introduced by appellant over the state's objection. [Citing Pulakis v. State, 476 P.2d 474, 479 (Alaska 1970).] However, we decline to decide the non-memory issue solely on this point in view of our conclusion that a finding of non-memory, even if it were supported by competent evidence, would not be inconsistent with the court's ultimate finding that appellant struck the fatal blow to his wife.

8. " . . . [V]oluntary intoxication is no defense to a crime, except insofar as the jury may take it into account in determining purpose, motive or intent." (footnote omitted)
McIntyre v. State, 379 P.2d 615, 617 (Alaska 1963). See also AS 11.70.030.
In this case appellant's intoxication constitutes no defense to the crime of manslaughter because the crime as defined under AS 11.15.040 requires no specific intent which could possibly be negated by the intoxication. See Jennings v. State, 404 P.2d 652, 655 (Alaska 1965) (manslaughter under AS 11.-15.040 requires no specific intent).

admitted that he had recently "beat up" Kitty, causing her hospitalization for a week and his incarceration for assault and battery. The statement was admitted into evidence without objection.[9] The fact that appellant previously beat his wife is relevant to the likelihood that he delivered the fatal blow on the evening of her death. The prior beating was not a minor incident, such as a slapping, but a severe assault which, when taken together with all of the other evidence, could well have led the court below to conclude that on the evening in question appellant again assaulted Kitty, causing her death.

We conclude that the circumstantial evidence in this case was substantial evidence sufficient, beyond a reasonable doubt, to support the superior court's finding that while appellant and Kitty were alone in their hotel room he struck the fatal blow. The testimony of the pathologist concerning the most likely cause and time of death, the undisputed fact that appellant and the deceased were the only persons in the hotel room, the fact that the deceased appeared to be suffering no physical distress when she entered the hotel, and the evidence tending to disprove the theory of an accident in the room, together with appellant's admission of previous violence toward his wife, constitute sufficient evidence from which a reasonable mind could conclude that there was no reasonable doubt as to appellant's guilt.

The decision of the superior court is affirmed.

CONNOR, J., not participating.

9. Since the statement was admitted without objection, we are not confronted with the rather difficult question of whether evidence of Emil's previous assault upon Kitty would be admissible over objection, despite its possible prejudicial effects. There are many technical rulings on the question of whether evidence of past similar crimes is admissible to show the bad character of the accused. In discussing why such evidence should be inadmissible, McCormick states:

"It is not irrelevant, but in the setting of jury-trial the danger of prejudice outweighs the probative value.

This danger is at its highest when character is shown by other criminal acts, and the rule about the proof of other crimes is but an application of the wider prohibition against the initial introduction by the prosecution of evidence of bad character. The rule is that the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is substantially relevant for some other purpose than to show a probability that he committed the crime on trial because he is a man of criminal character." C. McCormick, Law of Evidence § 157, at 327 (1954) (footnote omitted).

Wigmore discusses the question in somewhat more detail in his treatise on evidence. Regarding criminal cases involving hostility to a spouse or paramour, he expresses the general rule as follows:

"Where an emotion of hostility at a specific time is to be shown, the existence in the same person of the same emotion at another time is in general admissible." II J. Wigmore, Evidence §§ 396, 397, at 349, 353 (3d ed. 1940).

Wigmore cites numerous cases involving crimes of hostility by a husband against his wife in which evidence of a prior similar crime was admitted into evidence. Id. § 397, at 353–55 n. 1; e. g., Commonwealth v. Barnak, 357 Pa. 391, 54 A.2d 865 (1947) (evidence admitted in wife-murder case that wife had previously sworn to information charging her husband with unlawful assault); State v. Americk, 42 Wash.2d 504, 256 P.2d 278 (1953) (testimony as to beatings during marriage admitted in prosecution for placing explosives in former wife's car).