**Ronald STUMBAUGH, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 3937.**

Supreme Court of Alaska.

Sept. 7, 1979.

Paul L. Henderson, Anchorage, for appellant.

W. H. Hawley, Jr., Asst. Atty. Gen., Joseph Balfe, Dist. Atty., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

BOOCHEVER, Justice.

Ronald Stumbaugh appeals his conviction for first degree arson, contending that evidence of an experiment should not have been heard by the jury, that the police searched his mobile home before obtaining a warrant, and that the evidence against him was insufficient for conviction. Stumbaugh also challenges his sentence of five years and four months, with five years suspended, as excessive. We affirm the conviction and the sentence.

In order to resolve Stumbaugh's contentions, we find it necessary to detail the applicable evidence presented at the trial. Before coming to Alaska, Ronald Stumbaugh purchased a travel trailer, financed in part by a loan of approximately $3,000.00 from Credit Thrift, a finance company in Washington. The trailer was collateral for the loan.

After arriving in Anchorage with his foster son, Stumbaugh traded in the trailer to Anchorage Trailer Sales, receiving a $5,500.00 credit, and purchased a $34,099.00 1976 Schult mobile home. Stumbaugh arranged for financing from a bank and moved into the mobile home around July 19, 1977. Stumbaugh took out a package insurance policy which included $35,000.00 maximum against physical damage to the mobile home (from fire, vandalism, storms and the life), and $7,500.00 for loss of personal property (household furniture and personal effects).[1]

Around August 1, 1977, Stumbaugh obtained a job as a clerk in a supermarket, which had a Tesoro gas station attached to it. In his statement to the police, Stumbaugh said he pumped gas when the station needed help. At trial, Stumbaugh said he never worked at the station adjacent to his store, although he had twice done relief work at other Tesoro stations.

In August, when Ancorage Trailer Sales tried to sell the trailer that Stumbaugh had traded in, they found that it was subject to a lien for Stumbaugh's debt to Credit Thrift in Washington. Stumbaugh had made two payments in May to Credit Thrift, but none thereafter.[2] Stumbaugh testified that he thought he owned the travel trailer free and clear[3] and had made a personal loan, not one secured by the trailer, from Credit Thrift. The general manager at Anchorage Trailer Sales and the salesperson, who had arranged for the trade-in, contacted Stumbaugh a number of times and hinted at legal action if the matter was not resolved.

On August 16, 1977, around 10:00 in the evening, neighbors noticed flames in Stumbaugh's mobile home and called the fire department. Firefighters arrived at the scene within minutes, and extinguished the fire. An insurance adjuster testified that the trailer was a total loss, however. Stumbaugh and his foster son returned around midnight, after seeing a double feature. Stumbaugh had taken his two dogs and left them in his truck during the movies. A few days after the fire, Stumbaugh signed five $1,000.00 promissory notes to Anchorage Trailer Sales who, in turn, paid off Stumbaugh's debt to Credit Thrift.[4] Stumbaugh applied for insurance reimbursement the day after the fire.

Chief Anderson of the Anchorage Fire Department, a firefighter of eighteen years experience, was the senior official at the scene of the fire that evening. He noticed a number of things that piqued his interest: the most intensive burning in the living room; a flare up after the fire was out; an odor in the trailer, possibly of a flamable liquid; an unusual burn pattern on the carpet—heavily burned areas next to lightly burned ones; and some burning around the electrical receptacles. The odor, the burn pattern, and the momentary flare caused Chief Anderson to consider the possibility of an accelerant, that is, that a substance had "been poured there that caused the fire to burn on the floor in certain areas more than it did on other areas," but he formed no definite opinion.[5]

1. Stumbaugh indicated to the insurance agent, and it is uncontroverted, that the bank would not finance the purchase unless the mobile home was insured. The bank was named in the "loss payee clause" of the policy, which means it would receive any insurance proceeds from damage to the mobile home. The bank would not receive insurance proceeds from loss of personal property.

2. Stumbaugh said he made further payments but did not remember any details. Credit Thrift received no payments after May 23, except a check on August 10 for $3,500.00, which could not be cashed because of insufficient funds in Stumbaugh's account.

3. Due to an oversight, the encumbrance on the trailer was not properly noted on Stumbaugh's registration certificate.

4. Anchorage Trailer Sales only had to pay Credit Thrift $3,750.00, so presumably that is all Stumbaugh now owes ATS. In addition to the $3,000.00 loan for the purchase of the travel trailer, Stumbaugh owed Credit Thrift approximately $750.00, a debt also secured by the trailer.

5. Other odors from burning foam and plastic objects made him unable to identify with certainty the presence of an accelerant, and there was the possibility of an electrical fire.

John Glenn, an expert in arson investigation, was the Anchorage Fire Department investigator who worked on this case. Daniel Weatherly was the state trooper.[6] The two are frequently paired to investigate specific fires. The day after the fire, they obtained a search warrant for Stumbaugh's trailer. It was disputed whether the warrant was obtained before or after a search of the trailer.

Glenn and Weatherly went to the trailer; Chief Anderson arrived after them. Glenn and Weatherly took, among other things, two carpet samples, two electrical outlets from the living room, and an atomizer spray can. Chief Anderson and Investigator Glenn both thought the carpet smelled strongly of kerosene or diesel fuel. A thorough inspection found no appliance or furnace that used diesel fuel. Based on the burn pattern and the carpet's smell, both Anderson and Glenn concluded the fire had been spread by an accelerant. Chief Anderson stated, "You don't live in a trailer with—with flammable liquids poured all over the carpet."

Subsequent chemical analysis of the carpet samples and the atomizer revealed significant levels of petroleum hydrocarbons, similar if not identical to those found in Tesoro diesel fuel oil. Eugene Mockerman, an electrical expert in residential electric installation, examined the trailer itself and the outlets taken by Glenn and Weatherly. He concluded that the fire was not of electrical origin because the outlets were damaged "strictly on the outside. . . . There was no evidence whatsoever that there were—there were any electrical problems in the trailer at that time."

Investigator Weatherly took a statement from Stumbaugh two days after the fire. Stumbaugh denied any knowledge of how the fire started and gave signed permission for a further search of the trailer. That search occurred with Stumbaugh present and yielded a box of candles, with one piece of a candle missing. The box originally contained five candles. There were only three seven and three-quarter inch whole candles left, two partial bottom pieces, and one top piece.[7] The bottom pieces, when compared with the whole candle, were missing a two and a half inch piece.

Glenn and Weatherly later conducted an experiment with a two and a half inch piece of candle from the box, a pint of diesel fuel oil from the fire station, and a six foot piece of carpet of the type installed in Stumbaugh's trailer. They conducted the experiment in an abandoned box car where the temperature was about 35°. The investigators placed the carpet on a metal drip pan, poured on the oil, and put the lit candle on the carpet. The candle burned down to the carpet, igniting the diesel fuel, after one hour and fourteen minutes. Seventeen minutes later, the flame reached the end of the carpet. The fire burned along the path of the accelerant and consumed the entire candle. Glenn thought that "the carpeting from the test resembled the carpeting that was in the trailer house."[8] He concluded that the candle was probably used as a time delay device to ignite the fire.

The state's theory at trial was that financial pressures caused Ronald Stumbaugh to set fire to his own house.[9] A neighbor testified that he had seen Stumbaugh carrying boxes from his house a few days before the fire,[10] and the prosecutor empha-

6. Weatherly was assigned to the Criminal Investigation Bureau of the Municipal Metropolitan Fire Investigation Unit.

7. The two partial candles had been cut and the top pieces did not fit exactly with either bottom piece.

8. The test carpeting had, however, a "somewhat deeper" burn.

9. The witnesses who testified about Stumbaugh's financial position were the general manager of Anchorage Trailer Sales, the sales-

person that had dealt with Stumbaugh, and the branch manager of the Credit Thrift in Washington that had financed Stumbaugh's purchase of the travel trailer.

10. In his statement to the police, Stumbaugh stated that he took some boxes to his brother's house a few days before the fire. Stumbaugh was not asked about the boxes at trial. Stumbaugh's brother Don testified that Stumbaugh had brought some things from Seattle for him, but that he, Don, had gone to the trailer and picked up the boxes.

sized that Stumbaugh had taken his dogs with him to the movies. Chief Anderson and Investigator Glenn testified, giving their conclusions about the origin of the fire. Glenn testified about the results of both searches of Stumbaugh's trailer and explained the experiment with the candle in detail. The state called the personnel manager of Toppers Oil, the distributor for the Tesoro Company. He contradicted Stumbaugh's testimony that the Tesoro station adjoining his workplace and one of the stations where Stumbaugh did relief work did not pump diesel fuel oil. Mockerman, the electrical inspector, testified that the fire was not of electrical origin.

The main witnesses for the defense were Stumbaugh and his foster son. Both testified that they went to the movies, and Stumbaugh testified he learned of the fire only upon returning home that night. Stumbaugh had no idea how diesel fuel oil would have gotten on the carpet of his trailer. The defense emphasized the lack of direct evidence linking Stumbaugh to the fire, and the dissimilarities between the conditions of the experiment and the actual fire. Counsel's closing statement points to other possibilities for the origin of the fire: faulty electrical wiring, a foster son who wanted to help his father out of financial troubles, or arson by someone who was angry at Stumbaugh. The jury did not find these arguments persuasive and found Stumbaugh guilty of first degree arson, a violation of AS 11.20.010.

## I. THE EXPERIMENT

■ The basic requirement for admissibility of experimental evidence is that the experiment occurred under substantially similar conditions to the actual event.[11] In *Love v. State*, 457 P.2d 622, 627, 628 (Alaska 1969), we explained:

> [F]or [experimental] evidence to be admissible, it should have been developed under conditions substantially similar to

those surrounding the event in issue. The rule of substantial similarity of conditions does not require an identity of conditions but only that degree of similarity which will insure that the results of the experiment are probative. In some cases a high degree of similarity may not be attainable, yet the evidence nevertheless may be enlightening to the jury.

. . . . .

In applying the test of substantial similarity, the trial court should be guided by the following principles: Are the dissimilarities likely to distort the results of the experiment to the degree that the evidence is not relevant? Can the dissimilarities be adjusted for or explained so that their effect on the results of the experiment can be understood by the jury? In this connection the court must consider the purpose of the experiment and the degree to which the matter under experiment is a subject of precise science. [footnotes omitted]

*Love* involved a conviction for illegal commercial fishing, and the state introduced an experiment to show that the defendant's boat could not have made a legal set and then drifted into the closed area. Although the tide level and wind direction in the experiment were the same as the day in question, there were also significant differences. The defendant's boat had a partially hoisted seine, and it had been dragging a large number of fish in the submerged portion of the seine. The experiment did not evaluate the current below the surface, nor the effect of the possibly stronger wind. These differences made the experimental results "too speculative to be useful in a court of law." *Id.* at 628.

In *Nicholson v. State*, 570 P.2d 1058, 1064–65 (Alaska 1977), we applied the principles of *Love* to an experiment where a state trooper fired the defendant's shotgun

11. *Nicholson v. State*, 570 P.2d 1058, 1065 (Alaska 1977); *Love v. State*, 457 P.2d 622, 627–28 (Alaska 1969); *Odell v. Frueh*, 146 Cal. App.2d 504, 304 P.2d 45, 51 (1956); *Erickson's Dairy Products Co. v. Northwest Baker Ice Machine Co.*, 165 Or. 553, 109 P.2d 53, 55 (1941); *Fort Worth & Denver Ry. v. Williams*, 375 S.W.2d 279, 281–82 (Tex. 1964); McCormick on Evidence § 202, at 485 (2d ed. 1972).

to determine the distance and direction of shells ejected from the shotgun. We admitted that the differences pointed out by the defendant meant the experiment was not relevant to determine the ultimate location of the shells. But the experiment's similarities to the actual event—use of the same type of gun and ammunition—"were explained to the jury and the superior court admitted the results only on the issue of air distance traveled" by the shells. *Id.* at 1065.

 Of course, the trial court has wide discretion in evaluating whether "the probative value of the experimental evidence is outweighed by the possibility of prejudice, confusion of the issues or undue consumption of time." *Love v. State*, 457 P.2d at 627 (footnote omitted). As the court stated in *Tuite v. Union Pacific Stages, Inc.*, 204 Or. 565, 284 P.2d 333, 345 (1955):

> [T]he determination of the question whether such evidence as to similarity of conditions is sufficient to warrant the admission of the evidence as to the results of the experiment must necessarily remain a matter of judicial discretion, which determination will never be disturbed on appeal unless it is manifest that there has been an abuse of discretion.

The trial court did not abuse its discretion in admitting the experimental results at Stumbaugh's trial.

The state introduced the experiment to prove three points: first, the candle would work as a time delay device to ignite the fire; second, the fire would track the diesel fuel thereby producing a pattern similar to the one observed in Stumbaugh's trailer; and, third, the fire would completely consume the candle. Judge Ripley ruled that the differences in the experimental conditions did not make the evidence irrelevant to prove these points, concluding:

> [The] massive superficial differences in the environment in which the experiment [was] conducted [did] not go to the heart of the experiment. Therefore under the *Love* test I feel that . . . it cannot be said that the experiment is so dissimilar as to render it irrelevant. It is for the jury to weigh whether these matters are probative or not.

The defendant questions six aspects of the experiment. The two challenges to the type of carpet and the kind of oil are groundless.[12] The final challenge concerns a two and a half inch piece of candle. This length was used because that seemed to be the length of the piece missing from the box of candles found in Stumbaugh's trailer. The defendant's fourth, fifth, and sixth complaints go to the use of a pint of oil, the temperature in the box car, and the presence of a metal pan, rather than a foam pad, under the carpet. We note below specific considerations applicable to each of those aspects of the experiment, including that the lack of a foam pad, if anything, would have caused the experimental fire to burn more slowly.[13]

---

12. Stumbaugh questions the use of new carpet and asserts that the carpet was "simply assumed to be of the same type as that in Ronald Stumbaugh's home." A new carpet was used because Stumbaugh had lived in his trailer less than a month. Investigator Glenn asked Wayne Green, the manager of Anchorage Trailer Sales, for a sample of the carpet that would have been in Stumbaugh's trailer. Stumbaugh had a Schult trailer, and the manager directed that Glenn receive a sample of Schult carpet, which the trailer company kept "by the roll." The actual carpet from Stumbaugh's trailer was not used because of fire damage.

Stumbaugh also questions the use of diesel fuel oil from a fire station. Fire engines use automotive diesel fuel, the kind that would be pumped at gas stations. Also, Steven Ede,

qualified as an expert in chemical analysis, stated that diesel fuel oil is all "relatively similar," and the defendant presented no evidence to the contrary.

13. Investigator Glenn used a pint of oil. The defendant states that Glenn should have used the amount of fuel oil found in the carpet samples because, impliedly, that is how much the would-be arsonist used. Stumbaugh does not suggest any way to determine how much fuel oil was poured on the carpet; the carpet in the living room had been hosed to put out the fire.

The experiment occurred in a box car where the temperature was approximately 35°; no place that approximated the temperature of a residential trailer was available for an experimental fire. The temperature difference could

One flaw, however, is common to all of Stumbaugh's arguments about the conditions of the experiment. At best, the experimental differences go to the exact time, the hour and thirty-one minutes, it took the candle to burn and the entire piece of carpet to catch on fire. The exact time, however, was not important in the trial. The state used the experiment to prove that Stumbaugh could have left the trailer and the fire would not have started for some time thereafter. The quantity of oil used, the temperature in the box car, and the mental pan under the carpet did not make the experiment irrelevant to the jury's evaluation. The jury considered whether a candle could have been used as a time delay device to start the fire and whether the resulting fire would consume the entire candle and produce a burn pattern similar to the one in Stumbaugh's trailer. Our statement in *Love* bears repeating:

> The rule of substantial similarity of conditions does not require an identity of conditions but only that degree of similarity which will insure that the results of the experiment are probative.

457 P.2d at 627. The differences argued by Stumbaugh simply are not sufficient to make the experiment irrelevant for the points it was introduced to prove.

## II. THE SEARCH OF THE TRAILER

The defendant moved to suppress the results of the first search of Stumbaugh's trailer, arguing that the search occurred before the police obtained a warrant. The basis for this motion was Investigator Glenn's testimony that he went to the trailer at "approximately 2:00 to 3:00 in the afternoon," and Chief Anderson's testimony that he met Glenn and Weatherly at the trailer the "morning" after the fire. The court logs showed the warrant hearing was convened at 4:05 and recessed at 4:45.

Chief Anderson did not remember the exact time he went to the trailer and testified that his use of the term "morning" might have resulted from the fact that he gets off work at 10:00 a. m.[14] Investigator Glenn stated that he was not sure of the exact time he went to the trailer, but he knew that he did not go to the trailer before getting a warrant. Neither Glenn nor Anderson had taken notes on the time of their activities that day. Investigator Weatherly later testified that he and Glenn went to the district attorney's office around 3:15, and the district attorney drafted a search warrant. Then they went before the magistrate, departed around 4:32, and arrived at the trailer at 5:05. Weatherly, the state trooper, had kept notes of the day's activities, and he stated: "Usually I do most of the writing because [Glenn's] digging in the fire."

On appeal of a denial of a motion to suppress, we view the record in the light most favorable to upholding the trial court's ruling. *Gray v. State*, 596 P.2d 1154, 1158 (Alaska 1979); *State v. Stokes*, 2

---

not have misled the jury. The jury heard testimony that the higher temperature in the trailer might have caused the fire to burn more quickly there. The prosecutor admitted this might be true. Further, all that the temperature difference could have affected is the seventeen minutes that the fire took to travel across the carpet once the candle burned down. Stumbaugh does not suggest that the temperature difference would have appreciably affected the hour and fourteen minutes it took the candle to burn down.

A metal pan was placed beneath the carpet in the experiment to protect the floor in the box car. A foam pad was not placed beneath the carpet in the experiment, although Stumbaugh's trailer had a pad under the carpet. In the voir dire to determine the admissibility of the experiment, Investigator Glenn testified that the absence of a foam pad might have made the fire spread more rapidly in the experiment. This would mean that the fire in the trailer would have spread more slowly than the experimental fire, an inference that would have hurt Stumbaugh, rather than helped him. At trial, the defendant did not question Investigator Glenn or any other witness about the effect of the metal tray and the absence of a foam pad in the experiment.

14. Chief Anderson stated:

> My morning starts when I get off duty at—at 10:00 o'clock. So, that's why I was—felt so strong that—that here I had been home just a couple of hours and—and been called back. So, with that in mind, it is possible that it could have been later on in the afternoon.

Ariz.App. 530, 410 P.2d 487, 488 (1966).[15] The trial judge heard the witnesses. He concluded that Chief Anderson's reference to the morning was simply a "misrecollection," and that Glenn and Weatherly obtained a warrant before they went to Stumbaugh's trailer. The record supports that ruling.

### III. SUFFICIENCY OF THE EVIDENCE

■ Stumbaugh moved for a judgment of acquittal at the end of the state's case-in-chief and, therefore, preserved for appeal the general question of the sufficiency of the evidence against him. *Eliason v. State*, 511 P.2d 1066, 1071 (Alaska 1973). The question on appeal is whether the evidence, viewed in the light most favorable to the state,[16] could lead a reasonable jury to conclude that the defendant was guilty beyond a reasonable doubt.[17] No different standard applies when the state's evidence is circumstantial rather than direct.[18]

■ The state's evidence showed that the fire was a set fire, that the defendant had both the motive and opportunity to set the fire, and that the defendant's actions before and after the fire were consistent with having set it. This evidence is similar to *Peters v. United States*, 97 F.2d 500 (9th Cir. 1938), where the court found the evidence sufficient for an arson conviction.[19] We think that a jury could reasonably find Stumbaugh guilty of first degree arson based on the evidence presented by the state.

### IV. THE SENTENCE

Ronald Stumbaugh received a sentence of five years four months imprisonment, with five years suspended, and five years probation. After release from custody, Stumbaugh has to make restitution.[20] The maximum sentence Stumbaugh could have received was twenty years. AS 11.20.010.

■ The role of the sentencing court is to impose a sentence that appropriately reflects the varied purposes of criminal sanctions. It is the sentencing judge who must determine the priority and relationship of these purposes in any particular case. *Benefield v. State*, 559 P.2d 91, 97 (Alaska 1977); *Nicholas v. State*, 477 P.2d 447, 448 (Alaska 1970).[21] We review the

---

**15.** This is but an example of the general rule that on appeal, facts are viewed in the light most favorable to sustaining the judgment or verdict. *See, e. g., People v. Rittger*, 54 Cal.2d 720, 7 Cal.Rptr. 901, 355 P.2d 645, 653 (1960).

**16.** *Ladd v. State*, 568 P.2d 960, 969 (Alaska 1977), *cert. denied*, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978); *Stevens v. State*, 514 P.2d 3, 4 (Alaska 1973); *Hughes v. State*, 513 P.2d 1115, 1117 (Alaska 1973); *Beavers v. State*, 492 P.2d 88, 97 (Alaska 1971).

**17.** *Hughes v. State*, 513 P.2d 1115, 1117 (Alaska 1973); *Davis v. State*, 501 P.2d 1026, 1027 (Alaska 1972); *Beck v. State*, 408 P.2d 996, 997 (Alaska 1965); *Bush v. State*, 397 P.2d 616, 618 (Alaska 1964).

**18.** *Des Jardins v. State*, 551 P.2d 181, 184 (Alaska 1976). *See Tarnef v. State*, 492 P.2d 109, 116–17 (Alaska 1971); *Jordan v. State*, 481 P.2d 383, 386–87 (Alaska 1971). We recently stated:

The general rule is that any criminal offense or element of an offense may be established by circumstantial evidence unless there is an express requirement to the contrary. 1 C. Torcia, *Wharton's Criminal Evidence* § 6, at 4–5 (13th ed. 1972).

*Randall v. State*, 583 P.2d 196, 198 (Alaska 1978) (footnote omitted).

**19.** The defendant claimed to have left her house at 10:30, and two patrol officers saw the fire at 2:45. The state's evidence, all circumstantial, consisted mainly of the following: the kindling and paper, found in the floor baseboard of the house, allegedly used to set the fire; the fire burning undiscovered for four or five hours because the house was tightly closed; the locked doors when the fire was discovered, indicating that no one had broken into the house to set the fire; the financial pressures on the defendant which gave her a motive to set the fire; and the testimony that the home had no electrical problems. *Peters v. United States*, 97 F.2d 500, 501–02 (9th Cir. 1938).

**20.** He must pay $200.00 a month to Anchorage Trailer Sales for the travel trailer, then a sum to the bank and insurance company that reflects the monetary loss to the trailer from the fire.

**21.** These purposes are:

[R]ehabilitation of the offender into a noncriminal member of society, isolation of the

sentence, focusing on the character of the offender, the nature of the offense, and the need to protect the public, *Benefield v. State*, 559 P.2d at 97; *State v. Chaney*, 477 P.2d 441, 443 (Alaska 1970), and will modify the sentence only when it is clearly mistaken, *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

◼ Judge Ripley noted that Stumbaugh had no prior offenses and no underlying psychological or physical problems, such as alcohol or drug addiction. He noted Stumbaugh's well-above average military record, employment history, supportive family, and consistent cooperation in making court appearances.[22] Judge Ripley stated that the goals of isolating the offender, rehabilitation, and specific deterrence suggested that Stumbaugh should serve no time in jail.

The trial court, however, heard testimony that arson was the leading cause of fires in Anchorage. Acknowledging that this fire was of an unoccupied dwelling, Judge Ripley noted that the defendant did not have control of the fire after it was set. The fire endangered the lives of persons living in the trailer park and children who might have been playing around Stumbaugh's trailer. The prosecutor emphasized the danger to the firefighters who respond to fire calls. The trial judge, therefore, concluded that the goals of general deterrence and reaffirming societal norms required the sentence he imposed, including some jail time. Because Stumbaugh was under financial obligation to make restitution anyway,[23] Judge Ripley rejected the suggestion of Ms. Robson, author of the presentence report, that payment was a sufficient penalty. We think the trial court carefully applied the purposes of criminal sanctions when it sentenced Ronald Stumbaugh, and we find no error.

AFFIRMED.

---

offender from society to prevent criminal conduct during the period of confinement, deterrence of the offender himself after his release from confinement or other penological treatment, as well as deterrence of other members of the community who might possess tendencies toward criminal conduct similar to that of the offender, and community condemnation of the individual offender, or in other words, reaffirmation of societal norms for the purpose of maintaining respect for the norms themselves.

*State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970) (footnote omitted).

22. Stumbaugh returned to Washington in September 1977 to take a job. The presentence report recommended arranging for probation-ary supervision with the Washington authorities, a suggestion the sentencing court agreed with.

23. Judge Ripley stated:

[T]o put him on probation now and say, pay back the money, that does not have a deterrent effect because he owed the money when he set the fire. And why not take a chance on what is laughingly referred to in arson circles as Alaska refinance, if you owe the money, why not burn it down? If you get away with it, you're out free and if you get caught, you just have to pay it and you have to do it anyway. And so, to let it go on that basis does not adequately provide for any deterrent factor.